## STATE *v.* JOHN KEERAN.

Upon a motion in arrest of judgment filed by one convicted of keeping a tippling-shop in violation of chapter 73 of the Revised Statutes, entitled, " of the suppression of certain nuisances," the motion alleging the general ground, that the act is repugnant to the constitution and laws of the United States and the constitution of this state, no questions will be considered by the supreme court, to which the record is certified from the court of common pleas, but such as are apparent upon the record; and hence, the record not shewing the evidence upon which the conviction proceeded, the conviction will be presumed to have proceeded upon evidence of a kind and degree constitutionally unobjectionable, although the statute may authorize a conviction upon evidence short of the constitutional standard.

The general assembly have the constitutional right to regulate or prohibit the sale of intoxicating liquors within the limits of the state at the time of the prohibition, as well as of those brought within the state afterwards; and to provide a process by which, if illegally sold or kept for sale, they may be confiscated or destroyed, and to declare the buildings and places in which such liquors are illegally sold or kept for sale to be common nuisances; nor is such legislation, if the process provided to try the offender be not repugnant to sect. 10, art. 1, of the constitution, securing to persons accused of crime certain rights of trial, within the inhibition of that section.

A private individual cannot abate a common nuisance, any more than maintain a private action on account of it, unless it be specially injurious to him, and its abatement necessary to enable him to exercise his rights; the sole remedy, otherwise, being by indictment.

A common nuisance arising from the illegal use of a building, as for a bawdy-house, a gambling-house, or tippling-shop, is abatable at common law, not by the destruction of the building, but by the prevention of the illegal use; nor does chapter 73 of the Revised Statutes authorize any other mode of abatement.

The decision in *State* v. *Paul*, ante, 185, reviewed and confirmed.

INDICTMENT against the defendant for keeping and maintaining, at Cumberland, in the county of Providence, a certain common nuisance, to wit, a grogshop and tippling-shop, in violation

of the provisions of chapter 73 of the Revised Statutes, entitled, " Of the suppression of certain nuisances." The indictment contained the same counts as that against Sidney S. Paul for the same offence, reported, ante, 185 ; and after verdict of guilty in the court of common pleas for the county of Providence, the defendant interposed a motion in arrest of sentence, in the same words as that interposed by Paul in the above case. The motion raising constitutional questions, the case was, in compliance with the statute, certified by the court of common pleas to this court, for the determination of the same.

*J. M. Blake*, for the motion :—

The nuisance law is contrary to the provisions of the constitution of the United States and the bill of rights of this state, protecting life, liberty, and property, and the obligation of contracts, and securing to all accused persons the right of due process of law, and to be confronted with the witnesses against them ; and with the 14th section of the bill of rights, declaring that every man shall be presumed innocent until he is pronounced guilty by the law.

The provisions of the third section of the nuisance law, declaring that the notorious character of the premises, or the keeping of the implements or appurtenances usually appertaining to places where intoxicating liquor is sold, shall be sufficient *primâ facie* evidence that such premises are nuisances, are inconsistent with the constitutional provisions securing to the accused the rights of due process of law, to be confronted with the witnesses, and to be presumed innocent until pronounced guilty by law ; and as the statute provides for the conviction of the accused upon improper testimony, the court, upon motion, cannot presume or admit proof that the defendant was in fact convicted upon other and proper proof. 1 Gray, R. 39–48.

The *act for the suppression of intemperance* does not, as license laws do, regulate the sales of strong liquor, but absolutely prohibits all sales, except by town agents ; and it applies to liquor owned and manufactured, or bought to sell, and which the owner or manufacturer had contracted to sell, before the passage of the act, as well as to that afterwards manufactured, or bought, or contracted for.

The right *to sell* is an incident of the right of private property. 1 Blackst. Com. 138, 139; 2 Kent, Com. 319, 320, 326; *Wilkinson* v. *Leland*, 2 Pet. R. 657; Bouvier, Law Dict. tit. "Property." Strong liquors are properly subjects of private property. 5 Pet. R. 577; 1 Gray, R. 33, 46, 47. The law is prohibitory, and applies to liquor owned before and at the time of the passage of the act; and it is in violation of the rights of property guaranteed by the constitution, (*People* v. *Toynbee*, 20 Barb. 168, *Wynehammer* v. *People*, 3 Kern. 378,) because it declares the buildings in which the liquors may be kept for sale, as well as the liquors, to be public nuisances.

A public or common nuisance is *malum in se ;* (1 Hawk. 148; *James* v. *Hayward*, 4 Croke, 184;) and it is a subject for judicial investigation and determination, and not of legislative enactment. *People* v. *Toynbee*, 20 Barb. 190, 199; *Wynehammer* v. *People*, 3 Kern. 403, 434, 454.

· The law deprives an innocent owner of a building of legal protection of his property in it; for anybody may destroy or remove a common nuisance. 1 Hawk. 149; 1 Russ. on Cr. 303; *James* v. *Hayward*, 4 Croke, 184; *Lodie* v. *Arnold*, 1 Salk. 458; *Cope* v. *Marshall*, 2 Wilson, 58; Dalton's Justice, 122, 156; *Dewey* v. *White*, 22 Eng. C. L. R. 246; Bacon's Ab. Tit. "Nuisance," 6; Comyn's Dig. Action on Case for Nuisance, D. 4; 2 Swift, Dig. 351; 1 Bishop, Crim. Law, § 700; *Law* v. *Knowlton*, 26 Maine, 132; *Hart* v. *Mayor of Albany*, 9 Wend. 589; *Whetmore* v. *Tracy*, 14 Ib. 256; *Renwicke* v. *Morris*, 7 Hill, 575; 15 Wend. 397–399; 2 Barr, 114; *Day* v. *Gorsuch*, 4 Miller, 27; 1 Bennett, R. (Cal.) 466; *Gates* v. *Bincoe*, 2 Dana, 159; *Welch* v. *Stowell*, 2 Doug. (Mich.) 333; *Barclay* v. *Commonwealth*, 1 Casey, 503.

Besides putting the building in which liquors are sold out of the protection of the law, by the nuisance act, the owner may be deprived of such building without due process of law; for when one is convicted of keeping a nuisance, the judgment may be, besides the fine or imprisonment, that the *nuisance* be abated. 1 Russ. Cr. L. 305; *Taggart* v. *Commonwealth*, 2 Harris, (Penn.) 527; *Rex* v. *Stead*, 8 T. R. 142.

The *Attorney-General* was stopped by the court.

State *v.* Keeran.

AMES, C. J.[1] This is the second time that the constitutional validity of chapter 73 of the Revised Statutes, entitled " Of the suppression of certain nuisances," has been judicially before us, at the instance of the same counsel, and in the same mode; to wit, by a motion in arrest of judgment filed in the court of common pleas, after conviction, by an offender against the provisions of this chapter, and certified to us by that court. The questions raised in the former case were argued principally by the submission of a brief of points on the part of the defendant; the attorney-general having been stopped by the court. The court, soon after the argument, delivered an opinion, sustaining the act in the particulars in which it had been impeached; and the present argument, suggesting that there had before been no full hearing of the questions, and that the court hastily formed its opinion upon them, comes to us somewhat in the form of a criticism upon, and an answer to, that opinion. We have gladly availed ourselves of an opportunity to re-hear the same counsel, in full, upon these questions, and with every desire to correct any error into which, from any cause, we may have fallen. Having acted, and been obliged to act before, only with such light as was afforded to us, we have not come to the new hearing of these questions, as seems to be supposed by the counsel for the defendant, with a predetermination to support this statute. Like all other statutes of the general assembly, it is regarded by us as an act of a coördinate branch of the same government, with every presumption in favor of its constitutional validity; and only when its repugnancy to the constitution is made plainly to appear to us, shall we hold it, or any part of it, to be void, in obedience to the higher and controlling law of the constitution, which is alike obligatory upon the general assembly and upon ourselves. Seeking no collision with the legislative branch of this government, we shall shrink from none which is forced upon us; but endeavor, whilst we sit here, according to our oaths, " to support the constitution of the United States, and the constitution and laws of this state, and to administer justice, without respect of persons, and do equal right to the poor and to the rich." Nor shall we, on the other

[1] Mr. Justice Shearman sat with the court in this case.

hand, be deterred from supporting a statute limiting or suppressing the sale of liquors, if, in our judgment, constitutionally enacted, from any fear that we shall be suspected of interested motives under the circumstances in which we are placed.    For once, and for all, and everywhere, we desire it to be understood, that we look upon the highest judicial station as a station of infamy and disgrace, if it does not elevate us above every fear but that of doing wrong, and above every inclination but that of doing right.

With these remarks, which we deemed that the occasion called for, we propose to consider the fresh argument which has been addressed to us on the part of the defendant; resolved to give him the benefit of every constitutional restriction upon the legislative power, avoiding the statute under which he has been convicted, and to refuse to him every demand which he urges against that power, when exercised within the limits of the constitution.

1st. This statute is said to be void, because it conflicts with the constitutional presumption of the innocence of one accused of crime, and with his constitutional rights of trial, by setting up against the defendant, in relation to the offence with which he is charged, an artificial standard of *primâ facie* proof, unknown to the common law.    At the argument, we suggested, that this objection could not be urged in the case before us, unless, which was not claimed, it was contended, that the provision of the statute relating to proof avoided all of it that was necessary to a conviction in every possible state of the evidence, and although the proof was wholly of the kind and degree required by the common law.    The ground of this suggestion was, that the record before us, which alone we could consider upon a motion in arrest, did not show upon what evidence the defendant was convicted, and therefore did not raise the objection which we were asked to consider.    The counsel for the defendant, after arguing the point of practice, acquiesced in the suggestion of the court; but as we were desired specially to reconsider our judgment upon this point, we propose, shortly, to do so.

The record certified to us contains nothing but an indictment

in the usual form, charging the prisoner with having kept a building, place, or tenement used for the illegal sale 'and keeping for sale of intoxicating liquors; the verdict, which, upon trial of the defendant in the court of common pleas for this county, under the indictment, was returned against him; and a motion in arrest of judgment, which avers, generally, as the ground upon which it is filed, that the act under which the indictment was found, being chapter 73 of the Revised Statutes, "is repugnant to and inconsistent with the provisions of the constitution and laws of the United States, and repugnant to and inconsistent with the provisions of the constitution of Rhode Island." The kind or degree of proof exhibited against the accused upon his trial, which was admitted by the court, and upon which the conviction proceeded, nowhere appears upon the record, as it might and should have been made to do by a proper bill of exceptions, if the accused had desired to contest before us its constitutional character or adequacy as evidence. As a court of error, we have, and can have, no knowledge of the testimony admitted in the court below; and, as it is the duty of him who objects error in legal proceedings properly to present and point it out to the court upon which he calls to correct it, and as upon a motion in arrest no errors can be considered but those apparent upon the record, it would seem to be a necessary inference, that if no statement of the improper admission of, or rulings upon, testimony were brought upon the record by the defendant, it was because there were none for him to state.

It is now contended, that however this may be in general, the rule is the reverse in application to the case before us; and that if the statute, though it allows all evidence admissible by the rules of common law, *permit* the offence created by it to be proved by a kind or degree of evidence short of the supposed constitutional standard, we are bound to presume, in every case, upon a motion in arrest, that the conviction was procured upon objectionable rather than unobjectionable evidence. If we were to act upon such a notion, the consequence might be, that we should send back a case for a new trial upon a presumed objection which never existed; and for aught that we see, as often

as a verdict was rendered, must continue to reverse it, and to send the case back, upon a like false presumption. No reason is given why, in such a case, the plain and sensible rule of general practice, which requires him who would avoid a verdict for error first to point it out, should be reversed, or why a motion in arrest should go farther than to errors upon the record. If the court is not to learn the errors in the record from the record itself, how else are they to learn them? unless indeed, as contended, from the fancies of counsel, magnified into presumptions of law, not only against the settled rule, that no fact not apparent upon the record is, upon such a motion, to be presumed for either party, but, also, against all natural probability. It is said, however, that the supreme court of Massachusetts have decided to this effect in *Commonwealth* v. *Albro*, 1 Gray, 48, 49; or rather, that we must necessarily infer that they would so decide, from their decision in that case. The slightest examination of the case cited by him would have shown the learned counsel, that every fact and ruling which the court considered in that case was brought before them upon exceptions added to the record which came up from the court below, and that, therefore, no such question as that which we are now considering could possibly have arisen in that case. The court did indeed there decide, in substance, that where a statute creating a new offence prescribed an unconstitutional process for the purpose of punishing it, the process, unknown to the common law, and, like the offence, the mere creature of the statute, could not be helped by the magistrate's adding to it what the law did not require, to wit, that which was necessary to make it conform to the constitution. But the statute before us does not prescribe *the* evidence upon which conviction shall proceed under it; but leaves that, in general, to be governed by the well-known common-law rules of evidence. It merely provides, that in order to establish the character of the buildings, places, &c., declared by the first sections to be *common nuisances,* it shall not be *necessary* to prove an actual sale of intoxicating liquors in such buildings or places; but that the character of them, or of the persons resorting to them, or the keeping of the usual implements and appurtenances of a tip-

pling shop in them, shall be *primâ facie* evidence that such buildings and places are nuisances within the meaning of the said section. It did not thus prescribe the sole evidence for conviction of an offender against it, as the statute of Massachusetts did the sole process by which the property of an offender against it could be seized and confiscated or destroyed. If it had, then indeed, if the prescribed evidence fell short of the constitutional standard, the whole statute would have been void and of no effect. The line is very plain, in this respect, between a statute which, as construed, prescribes, in a necessary part of a new criminal proceeding, only that which is constitutionally void, and one that permits and gives force to something objectionable, when what is unobjectionable cannot be procured. In the former, to add anything to what the statute requires, is a work of supererogation on the part of one officially carrying out the statute; in the latter, by pursuing the unobjectionable course, he does that which the statute itself contemplates, and, by implication, enjoins. Upon mature consideration, therefore, we see no reason to alter our decision upon this point, made in the case of *State* v. *Paul.*

2d. It is contended, however, that the statute in question is wholly void, because repugnant to the 10th section of the first article of the constitution, which secures to persons prosecuted for crime certain rights of trial, for the double reason,—that, taken in connection with the statute for the suppression of intemperance, it deprives persons of their property in liquors lawfully held for sale at the time this system of legislation commenced, by making them unsalable, and because it also enables any one to destroy the buildings in which strong liquors are sold or kept for sale, by the statute outlawry of declaring such buildings to be common nuisances; or, at least, enables the court to do so in its sentence upon conviction. With regard to the first of these reasons, we do not propose to repeat the general remarks made by us in the *Matter of Dorrance Street,* 4 R. I. Rep. 244–246, in regard to the loose habit of taking constitutional clauses, which, from their history and obvious purpose, have a well-defined meaning, away from all their natural connections, and, by drawing remote inferences

from them, of pressing them into the service of any constitutional objection which the ingenuity or fancy of the objector may contrive or suggest. To such an extent has this gone, that there is hardly any act of ordinary legislation, passed to meet the new and constantly changing emergencies of society, that is not made to raise a plentiful crop of constitutional questions; so that a class of questions of the gravest and most important. character have thus been brought into jest and ridicule. A better illustration of the truth of those remarks could not be found than the argument which is now urged upon us, by inference, from the celebrated clause in question. As it stands in our constitution, it is: "In all *criminal prosecutions*, the *accused* shall enjoy the right to a speedy and public trial, by an impartial jury; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining them in his favor; to have the assistance of counsel in his defence, and shall be at liberty to speak for himself; nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land." Surely, if any clause in the constitution has a definite meaning, which should exclude all vagaries which would render courts the tyrants of the constitution, this clause, embodying, as it does, with improvements, the precious fruits of our English liberty, can claim to have, both from its history and long received interpretation. It is no vague declaration concerning the rights of property, which can be made to mean anything and everything; but an intensely practical, and somewhat minute provision, guarding the rights of persons *accused of crime*, at the various points at which they may be exposed, when pursued or on trial, to oppression from the state or its officials. The closing words of the clause, "*nisi per legale judicium parium suorum, vel per legem terræ,*" as they stood in Magna Charta, by well-settled interpretation, were designed to secure all the rights of an English freeman, whether peer or commoner, against royal power, by guaranteeing to him, when prosecuted at the king's suit, a trial by his equals, conducted according to the forms and by the process of the *English common law*—here, emphatically termed *the law of the. land.*

2 Coke's Inst. 48–50, &c.; Thomson's Magna Charta, 228, 229; 3 Blackst. Com. 350; 4 Ib. 424, n. 3; 2 Kent, Com. 13, n. b, and cases cited; 1 Tucker's Blackst. App. 304, 305; 3 Story on the Constitution, 661; *Greene* v. *Briggs*, 1 Curtis, C. C. R. 336, and cases cited. In the fifth article, in amendment of the constitution of the United States, the phrase "*per legem terræ*" is construed "*due process of law*," in the sentence as it there stands,— "nor be deprived of life, liberty, or property, *without due process of law.*"

Now, one would suppose that the purport of this clause in our constitution was specific and practical enough to exclude all vague and remote inferences from it; and yet we are pressed by this inference from it, that the constitution, by thus particularly securing those criminally prosecuted from forfeiture of life, liberty, or property, without due process of law, must certainly have designed to inhibit the legislature from regulating the vendibility of property in the state, by prohibiting its sale in certain modes and for certain purposes, deemed to be injurious to the health, morals, and general well-being of the community. Pushed to its necessary conclusions, the argument goes to this extent, that once make out that anything real or personal is property, as everything in a general sense is, and legislation, as to its use and vendibility, or the mode of vending and using it, must stop at the precise point at which it stood when the thing first came within the protection of this clause of the constitution. No matter how noxious may be the indiscriminate sale or use of the article, the legislature cannot regulate and guard it; no matter how destructive to health and morals, it cannot prohibit it. No matter how truly the places in which it is sold or kept for sale are, in general, common nuisances, the assembly is incompetent to declare them to be such, and to punish those who keep and maintain them contrary to its prohibition. Both the thing sold, and the place in which it is sold or kept for sale, are property; and all other legislation which restricts their vendibility or use, and therefore impairs their value, than that which first found them within the limits of the state, is prohibited by the constitution, and by this particular clause of it. So large an inference from so narrow premises, and one so

destructive to the just and necessary power of the legislature to define and punish crime, can find no warrant in legal logic, or in any rule or principle applied to the construction of constitutions or laws. Without unnecessarily criticizing the decisions of other states upon their peculiar local law, whether constitutional or statute, it is sufficient to say, that this article, as it stands in our constitution, admits of no such vague and general application. With us, it is the constitutional shield of *one accused of crime* against the sovereign many who are prosecuting him; and not a sword to cut down the power of the many, legislatively expressed, to declare what shall constitute a crime, when in future done by any or all. It guards the suspected and accused, the prisoner and captive, who need its protection; and has no application to the honored and free, whose rights of property are guarded by other clauses of the constitution, or by their rights and influence, as electors, under it. It is true that a statute invading the rights of trial of one prosecuted for crime, is not saved, as "the law of the land," in the sense of this clause; but it is equally true, that a statute which creates a new offence, but *does not* invade these rights, is not within its mischief or inhibition. There is indeed a constitutional provision limiting the power of the legislature to define and punish crime —the provision against *ex post facto* laws; the argument from which, as well as from the clauses of the constitution protective of the rights of property, have already been considered by us in application to the questions before us, in the case of *State* v. *Paul.* The meaning of these clauses, as we have seen, is too well defined by decision, to permit them to be set up in avoidance of every act of the legislature calculated consequentially to impair the value of property. The constitutional guard against such an act mainly arises from the structure of the government, the frequency of elections, and the consequent accountability of the representative to his constituents for the just exercise of the power with which they have vested him. To expect to find in a constitution such restrictions upon legislative power, that it can never be unwisely or even unjustly exercised, is to expect such narrowness of legislative power as to render it unfit for the necessary purposes for which it was designed. In

a popular government, as in all other governments, power must be reposed somewhere; and he does not take in its theory who does not see, that in the power of the people at short intervals to change their rulers and agents, consists their main security against the dangerous and excessive exercise of the powers necessarily vested in them.

We are quite satisfied both with the reasoning and the result of the supreme court of Massachusetts, when commenting, in *Fisher* v. *McGirr & others*, 1 Gray, 27, upon, and applying to the same subject, this very clause of the constitution of that state. " We have no doubt that it is competent for the legislature to declare the possession of certain articles of property, either absolutely or when held in particular places, and under particular circumstances to be unlawful, because they would be injurious, dangerous and noxious; and *by due process of law*, by proceedings *in rem*, to provide both for the abatement of the nuisance and the punishment of the offender, by the seizure and confiscation of the property, by the removal, sale, or destruction of the noxious articles." And again, after several illustrations drawn from legislation with regard to other subjects of property than liquors ; " The theory of this branch of the law seems to be this ; that the property, of which injurious or dangerous use is made, shall be seized and confiscated, because either it is so unlawfully used by the owner or person having the power of disposal, or by some person with whom he has placed and entrusted it, or at least, that he has so carelessly and negligently used his power and control over it, that by his default, it has fallen into the hands of those who have made, and intend to make, the injurious or dangerous use of it, of which the public have a right to complain, and from which they have a right to be relieved. Therefore, as well to abate the nuisance, as to punish the offending and careless owner, the property may be justly declared forfeited, and either sold for the public benefit or destroyed, as the circumstances of the case may require, and the wisdom of the legislature direct."

The other reason given now, as before, for deeming this statute violative of the constitutional provisions for the protection of private property is, that by declaring the buildings and tene-

State v. Keeran.

ments in which these liquors are sold or kept for sale to be common nuisances, such property of the citizen, no matter how innocently on his part it is thus illegally held or used, is thereby placed without the pale of legal protection, and may, by way of abating the nuisance, be destroyed by any one who can effect such destruction without committing a breach of the peace. In the opinion given by the court in the case of *State* v. *Paul,* without stopping to inquire what constitutional provision would be violated by such a legislative declaration even if attended by the supposed consequences, the short and simple answer to this argument, in substance, was, that no such consequence attended such a declaration, for the double reason, that the right of an individual to abate a public nuisance, like the right of an individual to maintain an action on account of it, depended upon its special injury to him, and the necessity arising from its special obstruction of his rights; the sole remedy for the injury sustained by him from the nuisance, in common only with the rest of the public, being by indictment; and that the only mode known to the common law of abating a common nuisance arising from the illegal use of property as distinct from its existence, was, by preventing the illegal use, and not by unnecessarily destroying the property itself.

In announcing legal propositions so simple and well sustained by principle as these, we did not deem it necessary to quote many decisions, and contented ourselves with two or three leading cases, the reasoning in which inevitably led to this conclusion.

It is now argued that we overlooked a distinction between private and public nuisances; the former being abatable only by the party specially *aggrieved,* and the latter by any one, whether aggrieved otherwise than in common with the rest of the public, or not. It certainly would be very strange if a general principle, applicable to every species of legal action recognized by the law as a suitable mode of redressing individual wrong, should not prevail, without regard to the technical character of the cause of injury, whether classified amongst public or private nuisances.

The law recognizes no Quixotry in the redress of grievances.

43 *

Private action of every nature, unless to prevent the commission of great crimes, is confined to private wrong; the injured individual alone being entitled to take it in his own recompense, or to prevent or to remove obstructions to the exercise of his private rights. For all public injuries, the public alone, through its appointed agents and in its appointed modes, can prosecute and punish. Unless specially injured or obstructed by a public nuisance, no individual can maintain an action for damages on account of it, or a bill in equity to procure its abatement by decree; and still less, one would think, for the sake of peace and good order, can any individual or number of individuals lawfully constitute themselves the redressers of public wrongs, and the abaters of public nuisances. A public nuisance specially injurious to me, or obstructive of my private rights, becomes thereby a private wrong, as well as a public injury; and in its former character only, enables me to recover against the wrongdoer a recompense in damages, or to remove it by a court's decree, or by my individual act. All wilful or unnecessary injury to wrongdoers or to their property is itself a wrong; else, as reasoned by Baron Parke, in *Davies* v. *Mann*, 10 M. & W. 548, 549, " a man might justify the driving over goods left on a public highway, or even over a man lying asleep there, or the purposely running against a carriage going on the wrong side of the road." No man can set up a public or a private wrong committed by another as an excuse for a wilful or unnecessary, or even negligent, injury to him or to his property; the necessity imposed by the wrongful act being his sole excuse for injury, in any form, to the wrongdoer. This principle of law and of morality is applied in a great variety of forms to a great variety of cases, and comes as near to universality of application as any recognized in our system of jurisprudence. So far from being unsupported, as is claimed, by any judge or respectable text writer, it is only by wresting the language of these sources of authority away from the connection in which it is used, or by supposing that every legal proposition embraces all its limitations, that any show of authority, in its application to the abatement by individuals of public nuisances, can be made against it. The limit to the right of an individual to abate a

public nuisance, suggested in *State* v. *Paul,* so reasonable in itself, so necessary to good order, and so conformable to good morals, is the settled law of Westminster Hall, by at least three express decisions of the Court of Queen's Bench. In *Mayor of Colchester* v. *Brooke,* 7 Ad. & Ell. N. S. 339, S. C. 53 Eng. C. L. R. 339, which was an action brought by the owner of an oyster-bed in the navigable portion of the river Colne, in the county of Essex, against the owner of a vessel, for so negligently and unskilfully navigating and directing his vessel, through his servant, as to run the same into, and thereby break up and injure the plaintiff's oyster-bed, the 6th plea in substance alleged, that the oysters and oyster brood were so placed, and in such manner, as unlawfully to diminish the depth of water, and greatly obstruct the navigation, to the common nuisance of the queen's subjects; but did not allege that the vessel could not, with due care and skill have passed up the river, or grounded, without doing the injury complained of. Upon issue joined upon this plea the jury found it for the defendant; but the court held the finding to be immaterial, for the following reasons given by the then chief justice, Lord Denman: " It is very important for the sake of the public peace, and to prevent oppression even to wrongdoers, not to confound common with private nuisances in this respect. In the case of the latter, the individual *aggrieved* may abate; 3 Blackst. Com. 5; so as he commits no riot in doing it; and a public nuisance becomes a private one to him who is specially and in some particular way inconvenienced thereby; as in case of a gate across a highway, which prevents a traveller from passing, and which he may throw down; but the ordinary remedy for a public nuisance is itself public, that of indictment; and each individual who is *only* injured as one of the public can no more proceed to abate than he can bring an action." In *Dimes* v. *Petley,* 15 Ad. & Ell. N. S. 276, S. C. 69 Eng. C. L. R. 276, to a similar action for so negligently navigating a ship in the Thames that she struck and damaged the plaintiff's wharf, one of the pleas in substance was, that the wharf projected into the navigable river beyond low-water mark, and unlawfully obstructed the navigation of part of the river, so that the liege

subjects could not use *that part* of the river unless the wharf were broken, as in the declaration mentioned; that the defendant had occasion to pass with his vessel over *that part* of the river, and in so passing did the damage; and that he managed his vessel with all such skill and care as would have been proper for the navigation, had the navigation of that part of the river not been so obstructed. This plea, upon issue joined, was found by the jury for the defendant; and the other pleas having been found for the plaintiff, leave was reserved to move to enter a judgment for him upon this plea also, which, after argument, was granted by the court.

Lord Campbell, the present chief justice of the Queen's Bench, in pronouncing the judgment of the court upon this motion, says: " But then arises the important question on the validity of the plea. We think it bad for not alleging that there was a necessity for the defendant to navigate the ship over that part of the river where the nuisance was, nor even that this part of the river was his right course, and that it would have been inconvenient and difficult to have taken any other course by which the nuisance might have been avoided. The mere statement that he had occasion to pass with his ship over the said bed and course of the said river would be true if he had to carry her up or down the river, although there might be ample space for conveniently doing so without coming in contact with the nuisance. Now *it is fully established*, by the recent cases of *Bridge* v. *Grand Junction Railway Company*, 3 M. & W. 244, *Davies* v. *Mann*, 10 M. & W. 546, and *Mayor of Colchester* v. *Brooke*, 7 Q. B. 339, that if there be a nuisance in a public highway, a private individual cannot of his own act abate it unless it does him a special injury; and he can only interfere with it as far as is necessary to exercise his right of passing along the highway; and without considering whether he must show that the abatement of the nuisance was absolutely necessary to enable him to pass, we clearly think that he cannot justify doing any damage to the property of the person who has improperly placed the nuisance in the highway, if, avoiding it, he might have passed on with reasonable convenience."

Lastly, in *Bateman* v. *Black*, 18 Ad. & Ell. N. S. 870; S. C.

83 Eng. C. L. R. 868, which was trespass for entering the plaintiff's close and pulling down a wall therein, one of the pleas was, that the close was a public pavement, within the Metropolitan Paving Act, 57 Geo. 3, ch. 29 ; that the plaintiff unlawfully, and contrary to the act, erected therein the said wall ; and because the wall encumbered the pavement, and the plaintiff refused on the defendant's request to remove the same, the defendant entered and pulled it down.    This plea, upon issue joined, being found for the defendant, the court held, upon the plaintiff's motion for judgment *non obstante*, that the plea was bad for not showing that it was absolutely necessary for the defendant, in order to exercise his alleged right of passage, to remove the wall.    " He was bound," says Lord Campbell, " according to *Dimes* v. *Petley*, 15 Q. B. 276, and the cases there referred to, to show, not only that he had such right, but that there was no way in which he could exercise it without the removal."    Farther authority and comment upon this point is unnecessary.

The other answer to this objection to the statute, made in the opinion in *State* v. *Paul*, is, that the only mode of abating a common nuisance which consists merely in the illegal use of real property, as of buildings or tenements for bawdy or gambling houses, known to the common law is, not by destroying the buildings, but by breaking up and preventing their illegal and noxious use.    This is so clearly established that it is conceded in the argument which has last been addressed to us.    It is contended, however, that the language of the statute we are considering does not admit of this reasonable common-law mode of abating such a nuisance, but imperatively requires that such houses, as well as tippling-shops, should be abated by their destruction.    We have looked in vain into this statute for anything which would bear so monstrous a construction.    The words of the act are, that " all buildings, places, or tenements *used* as houses of ill-fame, *resorted to* for prostitution, lewdness, or for illegal gaming, and all grogshops, tippling-shops, or buildings, places, or tenements *used* for the illegal sale or keeping of intoxicating liquors, or where intemperate, idle, dissolute, noisy, or disorderly persons *are in the habit of resorting*, are hereby

declared to be *common nuisances,* and are to be regarded as such." In the 6th section of the act, the town councils of the several towns, and the boards of aldermen of the cities of Providence and Newport, are empowered to pass such ordinances not inconsistent with the statute, as they may deem most effectual for the prevention, suppression, or abatement of any such nuisance, " or the said town councils or boards of aldermen may remove or cause to be removed any such nuisance *in the same manner as is by law provided for the removal of other nuisances.*"

It will be noticed that in the first section we have quoted, the buildings, &c., *used* for the illegal purposes are declared to be common nuisances ; that is, *when* used, whilst *used,* and no longer than whilst *used* for such purposes ; and it is only *when,* and *because,* they are applied to the illegal use, that they are declared to be common nuisances. This section of the statute thus makes the nuisance consist, not in the existence of the buildings, &c. themselves, but in the illegal use to which they are applied ; and without prescribing the mode of abating the nuisances caused, or saying one word about their abatement, leaves that as a consequence of the declaration, to be settled by the general law. The last or sixth section, it will be noticed, is express upon this subject ; for after vesting certain boards of magistrates with the power of passing ordinances for the prevention, suppression, or abatement of such nuisances, it provides, that these boards " may remove or cause to be removed any such nuisance *in the same manner as is by law provided* for the removal *of other nuisances.*" We have no statute which permits any person or official, unnecessarily to destroy buildings which are made nuisances merely by the uses to which they are applied ; and it is admitted that the common law does not, but points out and enjoins the mode which is suggested in our former opinion. There is no foundation, therefore, whatever, for the assertion of the learned counsel that this statute permits, and far less imperatively requires, the destruction of the buildings declared by it to be common nuisances even by the officials of the law ; and least of all as he contends, by any private individual. It is quite true, as he suggests, that a private indi-

vidual, not being the owner, would find it very difficult, if not impossible, with or without a breach of the peace, to prevent or break up the illegal use of a building, by way of abating a common nuisance arising from it; but for this very reason, it should have occurred to him, not that an individual must have the power of *destroying* the building, which would certainly cause a riot, but that in such cases there was no private right of abatement whatsoever.

Upon a careful review of our judgment in the case of *State* v. *Paul,* we see no reason to doubt the correctness of the conclusion to which in that case we arrived; and sustaining the decision of the court of common pleas which overruled this motion, our certificate must go to that court to proceed against the defendant in conformity with that decision.