William F. O'Neil, Deputy Chief of Police *vs.* Providence Amusement Company.

FEBRUARY 2, 1920.

Present:   Parkhurst, C. J., Sweetland, Vincent, Stearns, and Rathbun, JJ.

(1)   *Theatres.   Firemen.   Constitutional Law.   Freedom of Contract.   Due Process of Law.*

The provisions of Pub. Laws, 1919, cap. 1780, compelling the holder of a theatrical license in the city of Providence to pay three dollars a day to a person employed by him and stationed in the theatre to guard against fire, and providing that the salary shall not be reduced except by consent of the board of fire commissioners and that such person cannot be discharged without the prior approval of such board, are unrelated to the purposes of the act, which is intended to diminish danger from fire to those assembled in places of amusement and which in its other provisions fully meets all of the requirements of its enactment, and amply provides for the safety of the public, and are obnoxious to Cons. U. S. Art. XIV of Amendments, as depriving a licensee of freedom and liberty of contract, and as depriving him of his property without due process of law.

Sweetland and Rathbun, JJ., dissenting.

CRIMINAL COMPLAINT. Heard on constitutional questions.

VINCENT, J. This case comes before us upon the constitutionality of Section 5 of Chapter 131 of the General Laws of 1909 as amended by Chapter 1780 of the Public Laws of 1919, approved April 24, 1919. The act is entitled, "Of diminishing danger to life in case of fire."

The portion of the act which we are called upon to examine in the consideration of the questions presented to us is as follows: "The board of fire commissioners, or in case there is no such board, the chief of the fire department of every city shall station in every theatre during the time any audience is present therein a fireman, and the person or persons holding the license for the same shall pay such city for the attendance of such fireman the sum of two dollars, except in the City of Newport, where such person or persons holding the license shall pay such city for the attendance of such fireman the sum of three dollars, for every day during which any performance, show or exhibition shall be given therein: *Provided, however,* that in the city of Providence in lieu thereof the person or persons holding the license pertaining to such theatre shall employ at a salary of not less than three dollars per day a suitable person, approved by the board of fire commissioners thereof, who shall be stationed in such theatre during the time any audience is present therein, and who shall perform such duties as from time to time may be prescribed by said board to guard against fire, and to protect life and property in case of fire therein, and who shall not have any other duties and in case said board at any time shall withdraw its approval of any such person, another person approved by said board shall be employed in his stead; and no such employee approved as aforesaid shall be discharged by such licensee or licensees from his said employment nor his salary reduced except with the prior approval of said board; and said board from time to time may prescribe a distinctive uniform

and badge to be worn by every such employee during the time he is performing such duties; and said board from time to time may assign any officers or members of the fire department thereof to inspect such theatres and see whether such persons are properly performing their said duties therein, and such officers or members at all reasonable times upon showing their credentials shall be admitted free of charge into all parts of all theatres in said city; *and provided, further,* that in the cities of Woonsocket and Central Falls in lieu thereof the person or persons holding the license pertaining to such theatres shall employ a suitable person approved by the chief of the fire department thereof, who shall be stationed in such theatre during the time any audience is present therein, and who shall perform such duties as from time to time may be prescribed by said chief of the fire department to guard against fire, and to protect life and property in case of fire therein, and in case said chief of the fire department at any time shall withdraw his approval of any such person, another person approved by said chief of the fire department shall be employed in his stead; and no such employee approved as aforesaid shall be discharged by such licensee or licensees from his said employment except with the prior approval of said chief; and said chief from time to time may prescribe a distinctive uniform and badge to be worn by every such employee during the time he is performing such duties; and said chief from time to time may assign any officers or members of the fire department thereof to inspect such theatres and see whether such persons are properly performing their said duties therein, and such officers or members at all reasonable times upon showing their credentials shall be admitted free of charge into all parts of all theatres in said cities."

A complaint issued by the District Court of the Sixth Judicial District charged the defendant, holding a theatrical license in the city of Providence, with failure to pay three dollars a day pursuant to said Section 5 to one Robert S. Gallagher employed by said defendant to guard against

danger from fire in its theatre located in said city. The defendant pleaded not guilty.

At the hearing in the district court, it appeared that the defendant had not paid the sum of three dollars a day to the said Gallagher; that he had been employed for some two years, and still was employed, at two dollars a day; that he was approved as competent for such employment by the board of fire commissioners of the city of Providence; and that such approval was in force at the date of the complaint.

The defendant offered testimony as to the character of the contract of hiring, the seating capacity of the theatre in question, and the seating capacity of the theatres in the various cities of the State and then filed its motion to dismiss the complaint and to discharge the defendant on the ground that said act was unconstitutional.

The defendant was found guilty, sentence was stayed, and the constitutional questions raised by the motion to dismiss were certified to this court for determination.

The act in question appeared originally as Chapter 131 of the General Laws of 1909 and by Section 5 of the said original act it was provided as follows: "Sec. 5. The board of fire commissioners, or, in case there is no such board, the chief of the fire department, of every city shall cause to be installed and maintained in every theatre therein a fire alarm box, and shall station in every theatre, during the time any audience is present therein, a fireman, and the person or persons holding the license for the same shall pay such city for the attendance of such fireman the sum of two dollars for every day during which any performance, show, or exhibition shall be given therein. The board of police commissioners, or in case there is no such board, the chief of police of every city shall cause to be installed and maintained in every theatre therein a police call box."

Before noting the changes in this section brought about by the later amendatory acts it may be well to bear in mind that the original act provided that a member of the fire department of each city in the State should be stationed by

the fire commissioners or chief of the fire department in every theatre and that each theatre in which a fireman was so stationed should pay to the city the sum of two dollars per day for his attendance. At the January Session of the General Assembly, 1916, Section 5 was amended by Chapter 1366 of the Public Laws in respect to the theatres in Providence, the amendment providing that the licensee of the theatre should employ a suitable person, to be approved by the board of fire commissioners, who should perform the duties which had previously devolved upon the fireman stationed therein, and that such person so employed could not be discharged by his employer without the consent of such board.

At the January Session of the General Assembly, 1919, the act was again amended by Chapter 1780 of the Public Laws in respect to the theatres in the city of Newport, the amendment providing that the theatres in that city should pay the sum of three dollars per day for the services of the fireman stationed therein.

Later, at the same session, the act was further amended by Chapter 1780 of the Public Laws. It is upon the act as finally amended that the questions now submitted to us arise. Under the provisions of the act as it now stands, in the cities of Newport, Pawtucket and Cranston firemen must be stationed in theatres by the respective municipal authorities for which services the city of Newport is required to pay three dollars per day and the cities of Pawtucket and Cranston two dollars per day.

In the cities of Providence, Central Falls and Woonsocket a person approved by the board of fire commissioners, or other municipal authority, must be employed by the person holding a theatrical license to guard against danger by fire, and cannot be discharged by his employer without the consent of the proper municipal authority.

In the city of Providence such employee must be paid not less than three dollars a day while in Woonsocket and Central Falls no compulsory payment of any amount what-

soever is made necessary, and further, in Providence the salary of such person cannot be reduced without the previous approval of the board of fire commissioners while no such provision is in force as regards Woonsocket and Central Falls.

The defendant claims that Section 5 of Chapter 131, General Laws, 1909, as thus amended, is unconstitutional and raises the following questions:

(1) Does the provision compelling the holder of a theatrical license in the city of Providence to pay three dollars a day to a person employed by him and stationed in the theatre to guard against fire deprive the defendant of liberty and property without due process of law?

(2) Does such provision deny the defendant the equal protection of the law?

(3) Does the provision that the salary of the person employed to guard against fire shall not be reduced except by consent of the board of fire commissioners deprive the defendant of its liberty and property without due process of law?

(4) Does such provision deny the defendant the equal protection of the law?

(5) Does the provision that such employee cannot be discharged without the prior approval of the board of fire commissioners deprive the defendant of liberty and property without due process of law?

(6) Does the provision requiring the payment of three dollars a day violate the obligation of any contract between this defendant and Robert S. Gallagher mentioned in the complaint and warrant?

(7) Does the provision requiring the payment of three dollars a day violate Art. I, Section 2 of the Constitution of Rhode Island in that it does not distribute the burdens of the State fairly among its citizens?

The defendant advises the court in its brief and argument that it does not object to the provisions of Section 5 of Chapter 131 as amended by Chapter 1780 of the Public

Laws, in so far as they compel every person holding a theatrical license to employ a competent person to guard against fire in the theatre to which such license pertains, nor to the provision requiring such employee to be approved by the board of fire commissioners, nor to those portions of Section 5 as amended which give power to officers of the fire department to inspect theatres and ascertain whether such employee is properly performing his duty and, therefore, all discussion of those matters may be eliminated.

It may be further noted here that under Section 8 of said Chapter 131 of the General Laws of 1909 it is also provided that the license of any owner or lessee of any theatre who shall neglect or refuse to comply with any obligations imposed by said chapter may be suspended or revoked by the authority having the power to grant the same, thus preventing such owner or licensee from giving any performance or entertainment therein.

The defendant claims first that the portion of the act which compels the payment of three dollars a day to the person employed is unconstitutional in that it deprives the defendant of liberty of contract and deprives it of its property without due process of law and is, therefore, in conflict with the Fourteenth Amendment of the Constitution of the United States.

That the carrying on of a theatre or place of amusement is a private business has been clearly stated by this court in the case of *Buenzle* v. *Newport Amusement Association*, 29 R. I. 23, in which the following language of the court in *Horney v. Nixon*, 213 Pa. St. 20 was adopted and made a part of its opinion. "The proprietor of a theatre is a private individual, engaged in a strictly private business, which, though for the entertainment of the public, is always limited to those whom he may agree to admit to it. There is no duty, as in the case of a common carrier, to admit every one who may apply and be willing to pay for a ticket, for the theatre proprietor has acquired no peculiar rights and privileges from the state, and is, therefore, under no implied obligation to

serve the public. When he sells a ticket he creates contractual relations with the holder of it, and whatever duties on his part grow out of these relations he is bound to perform, or respond in damages for the breach of his contract," and the opinion further holds that no analogy can be drawn between a place of entertainment and a corporation affected with a public duty. Such therefore is the law of this state and it would be useless to pursue further the discussion of this particular point in the case. Reference however may be made to *Adair* v. *U. S.*, 208 U. S. 161 and *Coppage* v. *Kansas*, 236 U. S. 1, which sustain the proposition that while the duties of the person so employed may have to do with the public safety his employment remains a private relationship in its legal and constitutional aspects. Under the very terms of the act he is employed by the licensee of the theatre and from such licensee he receives his wages. He has no claim against anyone else for compensation for his services. The power of the board to pass upon his competency, prescribe his duties and scrutinize their performance are only matters of supervision in the interest of public safety.

The sole purpose of the act in question, as its title indicates, is to diminish the danger from fire to those who may assemble in places of amusement, a danger which not only arises from fire itself but also from the panic which is apt to seize upon an assemblage of people whose individual freedom of movement is more or less restricted. The act provides that every person holding a theatre license shall employ a suitable person approved by the board of fire commissioners who shall be stationed in the theatre during the time any audience is present therein; that such person shall perform such duties as may be prescribed by said board to guard against fire; that such person shall have no other duties; that said board may at any time withdraw its approval of any such person when another person approved by said board shall be employed in his stead; and that said board may assign any officer or member of the fire department to inspect the theatres for the purpose of ascertaining

whether the persons employed are properly discharging their duties. These provisions fully meet all the purposes and requirements of the act which is to protect the audience from the dangers of fire and to such provisions the defendant offers no objection.

(1) The act however goes further and provides that the licensee of the theatre employing such a person shall pay him a wage of not less than three dollars per day and that no such employee shall be discharged by such licensee from his employment nor his salary reduced except with the prior approval of the board.

In the case at bar it appears that one Robert S. Gallagher had been for a long period an employee of the defendant at its theatre in Providence charged with the duty of protecting the premises from the dangers of fire. His employment in that capacity had been approved by the board of fire commissioners and such approval had never been withdrawn; and that the defendant paid to the said Gallagher for his services the sum of two dollars per day. This arrangement between the defendant and Gallagher continued without interruption from the time when the latter was employed by the defendant down to April 24, 1919, when Chapter 1780 of the Public Laws was approved. Thereafter upon the neglect or refusal of the defendant to raise the pay of its said employee to three dollars per day the complaint was instituted under which the constitutional questions now before us have arisen.

The defendant contends that these provisions, compelling the payment of three dollars per day, forbidding the discharge of the employee without the approval of the board of fire commissions, and forbidding any reduction in the salary of such employee, are unconstitutional, being in violation of the Fourteenth Amendment of the Constitution of the United States.

These provisions seem to us to be unrelated to the purposes of the act. The safety of the public is amply provided for without them. If these provisions are eliminated

the act would still effectively provide for the safety of the people who may compose the audience and the degree of safety is neither increased or diminished by the amount of wages paid to the employee nor does it depend upon depriving the employer of the right to discharge his employee or to reduce his wages.   Whatever may be the amount of the wages paid to the employee and whoever may be empowered to reduce his salary or bring about his discharge, the fact remains that all the elements of the act bearing upon the safety of the public still remain in full force and effect.   A man whose competency is approved by the board of fire commissioners must be on duty whenever an audience is present, and at all times under the supervision of said board who may prescribe his duties and through inspection see that he discharges them properly, and who may in its discretion withdraw its approval thus compelling the licensee to employ another person in his stead who likewise can only act with the approval of said board.   Any failure on the part of the licensee to have an approved man on duty would bring about the cancellation of his license without which he could not continue his business.

As the amusement business is a private business and not a business affected with a public interest it may be exercised under the police power of the State.   But the police power of the State is subject to the limitations and provisions of the Federal Constitution as the Supreme Court of the United States has held in several cases.

In *Connolly* v. *Union Sewer Pipe Co.*, 22 Sup. Ct. Rep. 431, the court said:  "The question of constitutional law to which we have referred cannot be disposed of by saying that the statute in question may be referred to what are called the police powers of the state, which, as often stated by this court, were not included in the grants of power to the general government, and therefore were reserved to the states when the Constitution was ordained.   But as the Constitution of the United States is the supreme law of the land, anything in the Constitution or statutes of the states to the contrary

notwithstanding, a statute of a state, even when avowedly enacted in the exercise of its police powers must yield to that law. No right granted or secured by the Constitution of the United States can be impaired or destroyed by a state enactment, whatever may be the source from which the power to pass such enactment may have been derived. 'The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the supreme law.' The state has undoubtedly the power, by appropriate legislation, to protect the public morals, the public health, and the public safety; but if, by their necessary operation, its regulations looking to either of those ends amount to a denial to persons within its jurisdiction of the equal protection of the laws, they must be deemed unconstitutional and void." See also *Atchison, Topeka & Santa Fé Ry. Co.* v. *Vosburg,* 238 U. S. 56; *Buchanan* v. *Warley,* 245 U. S. 60.

The Fourteenth Amendment to the Constitution of the United States provides, "nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The meaning of this provision has been interpreted and defined by the Supreme Court of the United States in a number of cases. In *Allgeyer* v. *Louisiana,* 165 U. S. 578, the court said: "The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." And in *Coppage* v. *Kansas,* 236 U. S. 1, the word "liberty" as used in the Fourteenth Amendment

is defined as follows: "Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense." And to the same effect are the cases of *Adair* v. *U. S.,* 208 U. S. 161 and *Smith* v. *Texas,* 233 U. S. 630.

In the case of *Adair* v. *U. S., supra,* the court said: "While, as already suggested, the rights of liberty and property guaranteed by the Constitution against deprivation without due process of law, is subject to such reasonable restraints as the common good or the general welfare may require, it is not within the functions of government—at least in the absence of contract between the parties—to compel any person in the course of his business and against his will to accept or retain the personal services of another, or to compel any person, against his will, to perform personal services for another. The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it."

The case of *Wilson* v. *New,* 243 U. S. 332 is referred to in the brief of the complainant and also in the brief of the defendant. It involves the constitutionality of an act of Congress popularly known as the Adamson Act.

We do not deem it necessary to discuss that case at great length. The act provided among other things that, pending the report of a commission to investigate and deal with the wages of trainmen on interstate railroads, the then existing rate of compensation should "not be reduced below the present standard day's wage." It differs materially from the case at bar in that it was a temporary expedient resorted

to in the face of an emergency. It did not undertake to fix a permanent wage but to retain the already existing wage for a limited period of thirty days until, through an investigation then progressing, certain rights might be determined "leaving the employers and employees free as to the subject of wages to govern their relations by their own agreements after the specified time." The act was intended as an exercise of governmental power over a matter of interstate commerce or a business affected with a public interest. The act was passed to meet an emergency arising from a nation-wide dispute over wages between railroad companies and their train operatives in which a general strike was threatened which would bring about commercial paralysis and grave loss and suffering, the parties concerned being unable to agree. It was designed to bridge over a limited period within which the parties might reach an agreement.

The question in that case as stated by the court in its opinion was, "Did Congress have power under the circumstances stated, that is, in dealing with the dispute between the employers and employees as to wages, . . . to create by legislative action a standard of wages to be operative upon the employers and employees for such reasonable time as it deemed necessary to afford an opportunity for the meeting of the minds of employers and employees on the subject of wages? Or, in other words did it have the power in order to prevent the interruption of interstate commerce to exert its will to supply the absence of a wage scale resulting from the disagreement as to wages between the employers and employees and to make its will on that subject controlling for the limited period provided for?" The difference between the Adamson law and the act which we are considering, which fixes a permanent wage in the absence of any emergency, is so apparent that it need not be specifically pointed out. That the court recognizes a distinction between employment in a private business and an employment in a business charged with a public interest and that its decision is not intended to apply to the former

is fully evidenced in the opinion itself wherein it is stated, "Whatever would be the right of an employee engaged in a private business to demand such wages as he desires, to leave the employment if he does not get them and by concert of action to agree with others to leave upon the same condition, such rights are necessarily subject to limitation when employment is accepted in a business charged with a public interest," and it may be fairly said that the court confined itself solely to dealing with an employment charged with a public interest for the opinion states, "It is also equally true that as the right to fix by agreement between the carrier and its employees a standard of wages to control their relations is primarily private, the establishment and giving effect to such agreed on standard is not subject to be controlled or prevented by public authority.". And further that, "there is no question here of purely private right since the law is concerned only with those who are engaged in a business charged with a public interest."

In *Smith* v. *Texas*, 233 U. S. 630, the court, in passing upon a statute forbidding the employment of any person as a passenger conductor unless such person had had two year's experience as a brakeman or conductor of a freight train, declared that, "The liberty of contract is, of course, not unlimited; but there is no reason or authority for the proposition that conditions may be imposed by statute which will admit some who are competent and arbitrarily exclude others who are equally competent to labor on terms mutually satisfactory to employer and employé."

In *Gulf C. & S. F. Ry. Co.* v. *Ellis*, 165 U. S. 150, the court said, "While good faith and a knowledge of existing conditions on the part of a legislature is to be presumed, yet to carry that presumption to the extent of always holding that there must be some undisclosed and unknown reason for subjecting certain individuals or corporations to hostile and discriminating legislation is to make the protecting clauses of the Fourteenth Amendment a mere rope of sand, in no manner restraining state action."

We have already pointed out that it is obligatory upon the licensee, under the provisions of the act, to employ a person who shall attend at the theatre during the time when an audience is present for the purpose of guarding against fire; that such person must be approved by the board of fire commissioners; that such approval may be withdrawn compelling the licensee to employ another man; that said board may prescribe the duties to be performed; that the said board may direct some member of the fire department whose duty it shall be to make an inspection for the purpose of determining whether the person so employed is properly discharging his duties; and that these provisions of the act are not objected to by the defendant.

The act goes further and dictates a minimum wage and seeks to take away from the employer the right to discharge or reduce the wages of the employee whom he has employed in the conduct of his private business.   Neither of these last named provisions are essential or have any relation to the protecting features of the act which are its sole object and purpose.

We cannot assume that the legislative power has been properly exercised.   It does not follow that because the General Assembly has enacted a law that it must have had some good and sufficient reason for so doing although such reason may not be apparent.   The Court of Appeals of New York, *In re Jacobs*, 98 N. Y. 98, in a carefully considered and well reasoned opinion has satisfactorily disposed of that question, holding that while generally it is for the legislature to determine what laws are required to protect and secure the public health, comfort and safety, under the guise of police regulations it may not arbitrarily infringe upon personal or property rights; and its determination as to what is a proper exercise of the power is not final or conclusive but is subject to the scrutiny of the courts; and that when the legislature passes an act ostensibly for the public health, but which does not relate to the purpose sought to be carried out and which destroys the property or interferes with

the rights of the citizens, it is within the province of the court to determine that fact and to declare the act unconstitutional.

Other portions of the opinion in the *Jacob* case seem to have a substantial bearing upon the questions now before us. The court in stating the facts says, "The relator at the time of his arrest lived with his wife and two children in a tenement-house in the city of New York in which three other families also lived. There were four floors in the house, and seven rooms on each floor, and each floor was occupied by one family living independently of the others, and doing their cooking in one of the rooms so occupied. "The relator at the time of his arrest was engaged in one of his rooms in preparing tobacco and making cigars, but there was no smell of tobacco in any part of the house except the room where he was thus engaged. These facts showed a violation of the provisions of the act." The court then proceeded to quote the provisions of the act the first section thereof being as follows: "Section 1. The manufacture of cigars or preparation of tobacco in any form on any floor, or in any part of any floor, in any tenement-house is hereby prohibited, if such floor or any part of such floor is by any person occupied as a home or residence for the purpose of living, sleeping, cooking or doing any household work therein.". The title of the act was, "An act to improve the public health by prohibiting the manufacture of cigars and preparation of tobacco in any form in tenement-houses in certain cases, and regulating the use of tenement-houses in certain cases."

This law by its title and otherwise purports to be designed to promote the public health and the court says in respect to that, "When a health law is challenged in the courts as unconstitutional on the ground that it arbitrarily interferes with personal liberty and private property without due process of law, the courts must be able to see that it has at least in fact some relation to the public health, that the public health is the end actually aimed at, and that it is

appropriate and adapted to that end.   This we have not been able to see in this law, and we must, therefore, pronounce it unconstitutional and void." The court further says, "This law was not intended to protect the health of those engaged in cigarmaking, as they are allowed to manufacture cigars everywhere except in the forbidden tenement-houses.   It cannot be perceived how the cigarmaker is to be improved in his health or his morals by forcing him from his home and its hallowed associations and beneficent influences, to ply his trade elsewhere." "It is plain therefore that this law interferes with the profitable and free use of his property by the owner or lessee of a tenement-house who is a cigarmaker, and trammels him in the application of his industry and the disposition of his labor, and thus, in a strictly legitimate sense, it arbitrarily deprives him of his property and of some portion of his personal liberty".   The opinion also quotes with approval from the cases of *Austin* v. *Murray*, 16 Pick. 121, 126 and *Watertown* v. *Mayo*, 109 Mass. 315, 319.   In the first mentioned case the court said, "The law will not allow the right of property to be invaded, under the guise of a police regulation for the preservation of health, when it is manifest that such is not the object and purpose of the regulation," and in the last mentioned case the court said, "The law will not allow rights of property to be invaded under the guise of a police regulation for the preservation of health or protection against a threatened nuisance; and when it appears that such is not the real object and purpose of the regulation, courts will interfere to protect the rights of the citizen."

So in the case at bar, as we have already demonstrated, the purpose of the act is to protect the public from the dangers of fire and that the degree of protection for which the act provides can be neither increased or diminished by fixing the wages of the person employed in carrying out its provisions.

The defendant argues that if the lawmaking power can fix the wages of such employee it could with equal propriety

fix the wages of motormen, telegraph operators and of those engaged in a variety of other employments. We think there is much logic in that argument. In the *Jacob* case, *supra,* the court said, "Such legislation may invade one class of rights today and another tomorrow, and if it can be sanctioned under the Constitution, . . . we will not be far away in practical statesmanship from those ages when government prefects . . . regulated the movements and labor of artisans, the rate of wages, the price of food, the diet and clothing of the people, and a large range of other affairs long since in all civilized lands regarded as outside of governmental functions."

In *Lochner* v. *New York*, 198 U. S. 45, it was held that a statute of New York providing that no employees shall be required or permitted to work in bakeries more than sixty hours in a week, or ten hours a day, is not a legitimate exercise of the police power of the state, but an unreasonable, unnecessary and arbitrary interference with the right and liberty of the individual to contract, in relation to labor, and as such is in conflict with, and void under, the Federal Constitution.

*People* v. *Coler*, 166 N. Y. 1 is another case decided by the Court of Appeals of New York. A contractor having performed his contract for grading a public street and having received from the proper authorities a certificate that the contract price had been earned, it was held that he may compel the city to pay the amount due by mandamus although he has failed to comply with the labor statute regulating the amount of wages to be paid his employees on the ground that such labor law, in such respect, invades rights of liberty and property in that it denies to the city and the contractor the right to agree with their employees upon the measure of their compensation, and compels them to pay an arbitrary and uniform rate, and further, that in effect it imposes a penalty upon the exercise by the city or by the contractor of the right to agree with their employees upon the terms and conditions of the employment.

And it was held in the case of *Tannenbaum* v. *Rehm*, 152 Ala. 494, that a fireman assigned to duty at a theatre under an ordinance requiring the assignment, and providing that the manager of the theatre shall pay for such attendance, may bring his action against such manager for compensation for his services. The main contention in that case however was that the actual cost of the services could be collected, a point not involved here. It cannot be reasoned from this case that a property owner may be compelled to pay an amount in excess of cost and we need not consider the cases which deal with the right to reimbursement for the services of firemen appointed to duty at a theatre from the regular force of the city.

In *Nashville, Chattanooga and St. Louis Ry.* v. *Alabama*, 128 U. S. 96, the court held that a state statute which requires locomotive engineers and other persons, employed by a railroad company in a capacity which calls for the ability to distinguish and discriminate between color signals, to be examined in this respect by a tribunal established for the purpose, and which exacts a fee from the company for the service of examination does not deprive the company of its property without due process of law. In that case such provisions were not only closely related to the purposes of the act but were absolutely essential if the act was to be effective. As the court said in its opinion, "Color blindness is a defect of a vital character in railway employees . . . Ready and accurate perception by them of colors . . . are essential to safety of the trains, and, of course, of the passengers and property they carry" and the court further held that, "Requiring railroad companies to pay the fees allowed for the examination of parties who are to serve on their railroads . . . is not depriving them of property without due process of law. It is merely imposing upon them the expenses necessary to ascertain whether their employees possess the physical qualifications required by law.". The difference between that case and the case at bar is too apparent to require elucidation.

In *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire*, 219 U. S. 549, the question presented was as to the validity of an act precluding the railroad company from making the defense that recovery was barred by the acceptance of benefits under a contract of membership in its relief department. The defendant in error while acting as a brakeman in the service of the railroad company had received injuries for which he had recovered judgment. The railroad company claimed that the defendant in error having received the benefits to which he was entitled from the relief fund the payment and acceptance thereof subsequent to the injury constituted a full satisfaction of his claim.

The statute involved in that case is as follows: "Every corporation operating a railway shall be liable for all damages sustained by any person, including the employees of such corporation, in consequence of the neglect of the agents, or by any mismanagement of the engineers or other employees thereof, and in consequence of the wilful wrongs, whether of commission or omission of such agents, engineers, or other employees; when such wrongs are in any manner connected with the use and operation of any railway on or about which they shall be employed and no contract which restricts such liability shall be legal or binding. Nor shall any contract of insurance relief, benefit or indemnity in case of injury or death, entered into prior to the injury, between the person so injured and such corporation or any other person or association acting for such corporation, nor shall the acceptance of any such relief, insurance, benefit or indemnity by the person injured, his widow, heirs or legal representatives after the injury, from such corporation, person or association, constitute any bar or defense to any cause of action brought under the provisions of this section; but nothing contained herein shall be construed to prevent or invalidate any settlement for damages between the parties subsequent to the injuries received."

The railroad company contended that the statute attempts to prohibit the making of a contract for settlement "by acts

done after the liability had become fixed." The court however rejected that view holding that while the acceptance of benefits was, of course, an act done after the injury, the legal consequences sought to be attached to that act were derived from the provision in the contract of membership and that the stipulation which the statute nullifies is one made in advance of the injury, that the subsequent acceptance of benefits shall constitute full satisfaction. The full import of the case is that it is within the power of the legislature to provide that contracts entered into prior to the injury and designed to exempt the employer from liability shall not be legal or binding and that the statute cannot be abrogated by such a contract. The opinion itself excludes its application to the case at bar when it says, quoting from the case of *Frisbie* v. *United States*, 157 U. S. 160, 166, "The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property."

The weight of authority is well stated in 6 R. C. L. § 258, as follows: "Since an employee cannot be compelled to work against his will, it is generally recognized that he is at liberty to refuse to continue to serve his employer. In this respect the rights of the employer and the employee are equal. Any act of the legislature that would undertake to impose on an employer the obligation of keeping one in his service whom, for any reason, he does not desire, would be a denial of his constitutional right to make and terminate contracts and to acquire and hold property."

It may be here observed that the act before us seeks to deprive the licensee of the free exercise of his right to discharge his employee but does not attempt to place a similar restriction upon the right of the employee to leave the service of his employer.

We think that the provisions compelling the payment of three dollars per day, forbidding the discharge of the employee without the prior approval of the board of fire com-

missioners, and forbidding the reduction of his salary take away that freedom and liberty of contract to which the defendant is entitled under the Fourteenth Amendment to the Constitution of the United States and are, therefore, unconstitutional and void.

We do not think however that the elimination of these provisions tends to nullify the act as a whole but that the other requirements thereof remain in full force and effect.

Under the provisions of the act if the defendant fails to pay three dollars per day its license will be refused or taken away by the board of police commissioners and the defendant's business, otherwise lawful, will forthwith cease. It appears in the case at bar that the defendant prior to the objectionable enactment employed a person approved by said board, at two dollars per day, down to the time that the act fixing the wage at three dollars was passed. Such fixing of the price is made without regard to the market price of such services or whether employer and employee fix a lower rate. It seems to us that this is depriving the defendant of his property without due process of law and is therefore unconstitutional and void under the Fourteenth Amendment to the Constitution of the United States.

As the city of Providence does not furnish any of its employees to guard against fire in any of its theatres we need not discuss a number of cases cited in the briefs bearing upon the question as to whether the city could legally claim reimbursement for such services.

The defendant further claims that the act deprives it of equal protection of the laws contrary to Section 1 of the Fourteenth Amendment of the Constitution of the United States. In other words that the law which is applicable to all cities in the State imposes upon the owners or lessees of theatres in Providence a greater burden than is imposed upon others carrying on a similar business in other portions of the State and the defendant points out that in the cities of Pawtucket and Cranston the act provides that firemen from the city force must be stationed in each theatre to be

paid two dollars per day for their services and that in Providence the person employed by the owner or lessee of a theatre shall receive for his services not less than three dollars per day while in Woonsocket and Central Falls the act does not fix any wage to be paid to the person employed but leaves owners and lessees in the two cities last named to contract for such service in their discretion.

We do not think it necessary for us to discuss this question in view of the conclusions which we have already reached regarding the fixing of wages.

With that portion of the act eliminated which seeks to fix the wages of such employees the question of equal protection under the law disappears and becomes purely academic. With such elimination all parties will stand upon an equal footing and be left to contract for such required service upon such terms as may be in accordance with their own judgment and wishes.

If the employer and employee have a right to agree upon the terms of the employment it naturally follows that such employment may be terminated by either party without the interference or dictation of the board of fire commissioners and such right is well settled by authority. *Adair* v. *U. S.* 208 U. S. 161; *Coppage* v. *Kansas*, 236 U. S. 1.

Our decision is that General Laws, 1909, Chapter 131, Section 5, as amended by Public Laws, January Session, 1919, Chapter 1780 is in violation of the Fourteenth Amendment of the Constitution of the United States in so far as it undertakes (1) to fix the wages which a person holding a theatrical license shall pay to a person employed by him to guard against danger by fire; (2) to forbid the discharge of such person so employed without the consent of the board of fire commissioners; and (3) to forbid a reduction in the wages of such employee without the consent of the board of fire commissioners.

The papers in the case are sent back to the District Court of the Sixth Judicial District, with the decision of this court certified thereon, for further proceedings.

Rathbun, J., dissenting. I am obliged to dissent from the opinion of the majority and have, as I deem it my duty to do, without attempting to analyze said opinion in detail, here set out at length my opinion as to the legal principles involved in the constitutional question before us. I do this for the reason that the majority opinion appears to me to completely disregard the essential facts involved in the case; fails to make application of very elementary principles of the common law of contracts and particularly because said opinion adopts a novel and surprising position, opposed to the uniform decisions of this court and, so far as I can ascertain, to the decisions of all courts, as to the relative powers of the legislative and judicial departments of government.

The above entitled proceeding is a criminal complaint preferred against said respondent corporation in the District Court of the Sixth Judicial District. The matter is before us upon the certification of a constitutional question.

Said complaint charges that the respondent "being the person and corporation holding the license pertaining to the Bijou Theatre unlawfully did neglect and refuse to pay to Robert S. Gallagher, a suitable person approved by the Board of Fire Commissioners of said Providence, and employed by the said Providence Amusement Company, a corporation, and stationed in the said Bijou Theatre pursuant to the provisions of Section 5 of Chapter 131 of the General Laws of 1909 as the same was amended by Chapter 1780 of the Public Laws of 1919, the sum of three dollars per day while employed as aforesaid, against the statute and the peace and dignity of the state." To this complaint the respondent pleaded not guilty and at the trial in said district court questioned the constitutionality of said Section 5, Chapter 131, General Laws, 1909, as amended by Chapter 1780 of the Public Laws, January Session, 1919. The respondent was adjudged guilty, sentence was deferred, and said constitutional question has been certified to this court for decision.

Said Section 5 as amended so far as the same relates to the question now before us is as follows: "The board of fire commissioners, or in case there is no such board, the chief of the fire department of every city shall station in every theatre during the time any audience is present therein a fireman, and the person or persons holding the license for the same shall pay such city for the attendance of such fireman the sum of two dollars, except in the City of New-port, where such person or persons holding the license shall pay such city for the attendance of such fireman the sum of three dollars, for every day during which any perform-ance, show or exhibition shall be given therein: *Provided, however*, that in the city of Providence in lieu thereof the person or persons holding the license pertaining to such theatre shall employ at a salary of not less than three dollars per day a suitable person, approved by the board of fire com-missioners thereof, who shall be stationed in such theatre during the time any audience is present therein, and who shall perform such duties as from time to time may be pre-scribed by said board to guard against fire, and to protect life and property in case of fire therein, and who shall not have any other duties and in case said board at any time shall withdraw its approval of any such person, another person approved by said board shall be employed in his stead; and no such employee approved as aforesaid shall be discharged by such licensee or licensees from his said employment, nor his salary reduced except with the prior approval of said board; and said board from time to time may prescribe a distinctive uniform and badge to be worn by every such employee during the time he is performing such duties; and said board from time to time may assign any officers or members of the fire department thereof to inspect such theatres and see whether such persons are properly perform-ing their said duties therein, and such officers or members at all reasonable times upon showing their credentials shall be admitted free of charge into all parts of all theatres in said city; *and provided further*, that in the cities of Woonsocket

and Central Falls in lieu thereof the person or persons holding the license pertaining to such theatres shall employ a suitable person approved by the chief of the fire department thereof, who shall be stationed in such theatre during the time any audience is present therein, and who shall perform such duties as from time to time may be prescribed by said chief of the fire department to guard against fire, and to protect life and property in case of fire therein, and in case said chief of the fire department at any time shall withdraw his approval of any such person, another person approved by said chief of the fire department shall be employed in his stead; and no such employee approved as aforesaid shall be discharged by such licensee or licensees from his said employment except with the prior approval of said chief; and said chief from time to time may prescribe a distinctive uniform and badge to be worn by every such employee during the time he is performing such duties; and said chief from time to time may assign any officers or members of the fire department thereof to inspect such theatres and see whether such persons are properly performing their said duties therein, and such officers or members at all reasonable times upon showing their credentials shall be admitted free of charge into all parts of all theatres in said cities."

The respondent's various claims as to the unconstitutionality of said section are substantially as follows: 1. That said section compelling the holder of a license pertaining to a theatre in the city of Providence to pay three dollars per day to the person employed to guard against fire and to protect life in case of fire in such theatre, and in providing that the salary of the person so employed to guard against fire and to protect life in such theatre shall not be reduced except with the prior approval of the board of fire commissioners of the city of Providence deprives the defendant of its liberty and property without due process of law in violation of Section 1 of the Fourteenth Amendment of the Constitution of the United States. 2. That said section by imposing

an unequal burden on the defendant as against the burdens imposed on other persons holding theatrical licenses in other cities in the State of Rhode Island and in providing that the salary of the person employed to guard against fire and to protect life in a theatre in the city of Providence shall not be reduced except with the prior approval of the board of fire commissioners of the city of Providence denies to the defendant the equal protection of the laws in violation of Section 1 of the Fourteenth Amendment of the Constitution of the United States.  3.  That the provision of said section compelling the holder of a license pertaining to a theatre in the city of Providence to pay three dollars per day to the person employed by such holder to guard against fire does not distribute the burdens of the state fairly among its citizens, and is in violation of Article I, Section 2 of the Constitution of the State of Rhode Island.  4.  That the provision of said section compelling the holder of a license pertaining to a theatre in the city of Providence to pay three dollars per day to the person employed by such holder to guard against fire and to protect life in such theatre deprives the defendant of its liberty and property without the judgment of its peers and is in violation of Article I, Section 10, of the Constitution of the State of Rhode Island.  5.  That the provision of said section fixing the salary of the person employed to guard against fire in a theatre in the city of Providence impairs the obligation of a contract existing between the defendant and Robert S. Gallagher and is in violation of Article I, Section 10, of the Constitution of the United States.

The section in question is plainly an attempt on the part of the General Assembly in the exercise of its police power to legislate for the safety and welfare of the people.  As was stated by this court in *Opinion to the Governor*, 24 R. I. 603, 605, "There is also a common assent that the legislature has the right of control in all matters affecting public safety, health and welfare, on the ground that these are within the indefinable but unquestioned purview of what is

known as the police power. It is indefinable because none can foresee the ever changing conditions which may call for its exercise; and it is unquestioned because it is a necessary function of government to provide for the safety and welfare of the people."

In *Barbier* v. *Connolly*, 113 U. S. 27, the court said: "But neither the Amendment" (the Fourteenth Amendment), "broad and comprehensive as it is, nor any other amendment was designed to interfere with the power of the State, sometimes termed its 'police power,' to prescribe regulations to promote the health, peace, morals, education and good order of the people."

It is beside the mark for the respondent to claim that it is beyond the power of the General Assembly to provide these regulations for the conduct of the theatrical business in this state, because the operation of a theatre is a private business. The purpose of the statute is not primarily to regulate the business of the holders of theatre licenses; but to guard the safety of those who attend theatrical entertainments. In the city of Providence upon every secular day the audiences in the many theatres number thousands, a large proportion of whom are women and children. Experience has forcibly demonstrated the great hazard to which such audiences are subjected in the absence of safeguards for their protection and constant vigilance that such safeguards are maintained. It has been shown in many instances that the maintenance of such regulations for the safety of audiences cannot prudently be left to the initiative or to the control of the theatre managers or their employees. Although the operation of theatres may in law be regarded as a form of private business the care for the safety of theatrical audiences clearly presents a field for the exercise of the police power of the state for the public welfare. *Tannenbaum* v. *Rehm*, 152 Ala. 494; *Hartford* v. *Parsons*, 87 Atl. 736.

The respondent contends that said section in requiring that it as the operator of a theatre in the city of Providence should employ a fire guard or inspector at a salary of not less

than three dollars per day and that said guard should not be discharged nor his salary reduced except with the approval of the board of fire commissioners interferes with the respondent's right to freely contract with its servant and thus deprives it of its liberty without due process of law.    It has been held that the right to make contracts is embraced in the conception of liberty guaranteed by the Fourteenth Amendment.    This was pointed out by the court in *Allgeyer* v. *Louisiana*, 165 U. S. 578;  *Lochner* v. *N. Y.* 198 U. S. 45; *Adair* v. *U. S.*, 208 U. S. 161;  *Coppage* v. *Kansas*, 236 U. S. 1.    It may be noted in passing that the respondent and the majority opinion place great  reliance upon the authority of the cases just cited, but the legislation under review in those cases had no reference to health, safety, morals or the public welfare;  and it is in the regulation of those matters alone that the legitimate field is presented for the exercise of the police power.    In *Allgeyer* v. *Louisiana*, 165 U. S. 578 the court was considering the application of a statute of Louisiana, regulating insurance upon property in said state to a contract of insurance made in New York. In *Lochner* v. *New York*, 198 U. S. 45, a statute of New York regulating the hours of labor of bakers was declared to have no relation to public health and not an exercise of the police power.    In *Adair* v. *United States*, 208 U. S. 161, an act of Congress making it an offence for a public carrier to discharge an employee because he was a member of a labor organization was held not to be within the power of Congress in the regulation of interstate commerce.    In *Coppage* v. *Kansas* the court was considering a statute of Kansas making it a misdemeanor for an employer to require an employee to agree not to become or remain a member of  a labor organization during the time of the employment. Those cases therefore are not in point upon the question now before us.    They all admit that when the police power may properly be exercised for the preservation of public health and safety, as Mr. Justice PITNEY says in *Coppage* v. *Kansas*, 236 U. S. 1, "Such police regulations may reason-

ably limit the enjoyment of personal liberty including the right of making contracts." Mr. Justice HUGHES, in commenting upon these cases in *Chicago* v. *McGuire*, 219 U. S. 549, at 567, says: "But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right"; and further, that the right to make contracts "is subject also, in the field of state action, to the essential authority of government to maintain peace and security, and to enact laws for the promotion of the health, safety, morals and welfare of those subject to its jurisdiction." Said justice then cites at page 568 a list of cases in the United States Reports which supports the doctrine which he has enunciated.

In *Chicago, &c. R. R. Co.* v. *McGuire, supra,* the court held that the "State has power to prohibit contracts limiting liability for injury made in advance of the injury received and to provide that the subsequent acceptance of benefits under such contracts shall not constitute satisfaction of the claim for injuries received after the contract," and that "such a statute does not impair the liberty of contract guaranteed by the Fourteenth Amendment."

In *State* v. *Read*, 12 R. I. 137, the defendant had been convicted on a complaint charging him with "keeping and exposing for sale certain drinks, food and merchandise" in violation of the following statute: "Sec. 1. Whenever any religious society shall hold any camp, tent, grove, or other out-door meeting, for any purpose connected with the object for which such religious society was organized, no person, without the consent of such religious society or of its proper officers, shall keep in any shop, tent, booth, wagon or carriage, or other place for sale, or expose for sale any spirituous or intoxicating liquors, or other drinks, or food, or merchandise of any kind, or hawk or peddle any such liquors, or merchandise within one mile of the place of such meeting; . . . *Provided, however,* that nothing herein contained shall be construed to prevent innkeepers, grocers, or other persons from pursuing their ordinary business at their usual

place of doing business, nor to prevent any person from selling victuals in his usual place of abode."

The defendant had leased land for the purpose of selling food but the statute prohibited his enjoying the privileges provided for in his contract.  He as well as all land  owners, except "inn keepers, grocers or other persons," "pursuing their ordinary business at their usual place of doing business," and a person "selling victuals in his usual place of abode," within one mile of the meeting were by the act denied the liberty of acquiring property by making contracts for the sale of food and other merchandise.  But this court held that the statute was constitutional as a valid police regulation.

In the case of *In re Williams, Petr.*, 79 Kas. 212, the court upheld a statute which interfered with the petitioner's liberty of making contracts for the sale or delivery of black powder. The act provided as follows:   "It shall be unlawful for any individual, firm or corporation to sell, offer for sale or deliver for use at any coal mine or mines in the State of Kansas, black powder in any manner except in original packages containing twelve and one-half pounds of  powder, said package to be securely sealed," &c.  The statute applied to no explosive except black powder and was limited to coal mines, but the court held that the act was a valid police regulation and did not violate the state constitution or the Fourteenth Amendment.

In *Dayton Coal & Iron Co.* v. *Barton*, 53 S. W. (Tenn.) 970, the court upheld a statute which interfered with the obligation of contract, existing between employer and employee, that the employee should receive a certain portion of his wages in orders on the employer's store.  The act provided, "that all persons using store orders to pay their employees shall if demanded redeem the same in the hands of the employee or a *bona fide* holder, in money."  The court held that the statute was a valid police regulation and did not violate the state constitution or the Fourteenth Amendment.

And in *Davis Coal Co.* v. *Polland*, 158 Ind. 607, where the statute required as a safety appliance that mines be propped up and gave a right of action to employees for any injury occasioned by failure to comply with the provisions of the statute, the employee not only knew the risk but had by contract with the mine owner waived the right provided by statute to have the mine roof propped up for his safety. The court held that the contract was unenforceable and that the employee could recover for the injuries received by reason of the owner's failure to do that which the employee had agreed for a good consideration that the owner need not do. The court held that the act was a proper police measure and not unconstitutional.

See *People ex. rel. N. Y. Electric Lines Co.* v. *Squire,* 107 N. Y. 593. The city of New York had by contract given the electrical company the right to use the city streets. The statute requiring electrical conductors to be placed underground imposed a heavy financial burden upon the electrical company as a condition precedent to its enjoying the benefits to be derived from its contract. The New York Court held that the act was a valid police measure and was not unconstitutional as in violation of the contract wherein the electrical company obtained from the city the right to use the streets. On appeal the act was upheld by the United States Supreme Court. See *People ex. rel. N. Y. Elec. Lines Co.* v. *Squire,* 145 U. S. 175.

In *Presbyterian Church* v. *N. Y. City,* 5 Cow. 538, an ordinance was held valid which prohibited the use for burial purposes of land which the city had previously conveyed to the plaintiff for church and cemetery purposes by deed containing full covenants of warranty. The court held the ordinance to be a valid police measure.

In *Silz* v. *Hesterberg,* 211 U. S. 31, an act prohibiting the purchase, sale or possession of game during the closed season, even when the game was lawfully killed in a foreign country, was held to be a proper police regulation and not in violation of the state constitution or the Fourteenth Amendment.

In *Geer* v. *Conn.*, 161 U. S. 519, an act was held valid as a police measure which prohibited the sale and shipment out of the state of game lawfully killed. To the same effect see *Kidd* v. *Pearson*, 128 U. S. 1; *Hall* v. *DeCuir*, 95 U. S. 485; *Sherlock* v. *Alling*, 93 U. S. 99 and *Gibbons* v. *Ogden*, 9 Wheat. 1.

In the following cases statutes limiting the right to contract have been held constitutional as valid police measures: In *Holden* v. *Hardy*, 169 U. S. 366, an act limiting labor in mines to eight hours a day; In *Soon Hing* v. *Crowley*, 113 U. S. 703, an act prohibiting work in laundries from 10 P. M. to 6 A. M.; to the same effect see *Barbier* v. *Connolly*, 113 U. S. 27. In *Munn* v. *People of Ill.*, 94 U. S. 113, an act fixing the maximum charge for storing grain and prohibiting contracts for a larger amount, and in *Frisbie* v. *U. S.*, 157 U. S. 160, an act of Congress prohibiting attorneys from contracting for a larger fee than ten dollars for prosecuting pension claims.

In *Opinion to House of Representatives*, 163 Mass. 589, the court held constitutional an act requiring all corporations, copartnerships or individuals engaged in any manufacturing business and employing more than twenty-five employees to pay wages weekly, thus interfering with the right to freely contract.

In *Gundling* v. *Chicago*, 177 U. S. 183, 188, the court said: "Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country and what such regulation shall be and to what particular trade, business or occupation they shall apply are questions for the state to determine, and their determination comes within the proper exercise of the police power by the state and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and the personal rights of the citizen are unnecessarily and in a manner wholly arbitrary interfered with or destroyed without due process of law, they do not extend beyond the power of the state to pass and they form no subject for Federal interference."

We have at this length considered the respondent's claim that under the Fourteenth Amendment there has been secured to the theatre manager the absolute and unqualified right to contract as to the service and the compensation of the fireguard or inspector stationed at its theatre and that said Section 5, in violation of the Fourteenth Amendment, has undertaken to control the contract between *it* as a *master* and said inspector as a *servant.* In making this contention the respondent and the majority opinion completely lose sight of the fundamental principles underlying the relation of master and servant. These principles are too elementary to require statement save for the fact they have been entirely disregarded by said argument and majority opinion. The relation of master and servant exists only when "the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, not only what shall be done, but how it shall be done." 26 Cyc. 966. "He is to be deemed a master who has the superior choice, control, and direction of the servant, and whose will the servant represents, not merely in the ultimate result of the work but in the details." 26 Cyc. 965. An examination of said Section 5 unmistakably indicates that the relation there established between a theatre operator and a fire inspector is entirely lacking in the elements essential to the relation of master and servant. Disregarding for the time those provisions the validity of which the respondent questions( viz., fixing a minimum salary and providing that the fireguard may not be discharged or his salary reduced "except with the prior approval of said board"), it appears that in the city of Providence the licensee of a theatre shall employ a suitable person approved by the board of fire commissioners who shall be stationed in such theatre during the time any audience is present therein, who shall perform the duties prescribed by the board to guard against fire and to protect life and property in case of fire in such theatre, who shall not have any other duty, and in case said board at any time

shall withdraw its approval of such person another person, approved by said board, shall be employed in his stead. The theatre licensee has neither the unrestricted choice, control or direction of the inspector. Such licensee can only employ an inspector approved by the board of fire commissioners. The period during which his services are to be performed are fixed by law. The licensee cannot prescribe his duty, such direction being vested in the fire commission; the licensee may not require or receive services from the inspector beyond the duties prescribed by said board. If said board is not satisfied with the manner in which the inspector performs his duties he must be replaced by another inspector approved by the board; and the power is given to the board and not to the licensee to prescribe the uniform and the badge to be worn by such inspector. Said section does use the word "employ" with reference to the appointment of such inspector. The respondent seizes upon said word as indicative of the nature of the inspector's service and appears to assume that since masters "employ" their servants the employment of the inspector by the licensee makes said inspector the servant of the licensee. Such reasoning magnifies the use of a somewhat indefinite word into an indication of legislative intent contrary to and inconsistent with all the other provisions of said section. It is plain that the limit of the intention of the General Assembly in the use of the word "employ" was to permit the theatre licensee in Providence to nominate for the approval of the fire commissioners, or to select for their approval, the person who should act as fire inspector in the theatre of such licensee but the person so nominated when approved by the board did not become in the slightest particular the servant of such licensee but became the person charged with the performance of a public duty under the direction of the board of fire commissioners. For the court to give the conclusive force to the word "employ" which the respondent urges would be to question the deliberate action of a coördinate branch of the government upon a mere verbal quibble, and to magnify what is

clearly circumstantial into something essential and intrinsic. Under the statute the nature of the duties to be performed by the theatre fire guards in each of the cities of the state are the same whether said fireguard be a member of the fire department of such city or a person selected by the theatre licensee and approved by the board of fire commissioners or the chief of the fire department of such city, save that in the city of Providence it is specially provided that the duties of the fireguard shall be restricted to the public duty of guarding against fire and protecting life and property in case of fire and that he shall have no other duty. This provision would completely exclude the performance by the inspector of any service for the theatre licensee in the ordinary conduct of its business as the operator of a theatre. It is clear to us that the fireguard stationed in a theatre is not the servant of the theatre licensee but a person charged with the performance of a public duty, and all the respondent's criticism of said Section 5 as an attempt to interfere with its right to contract freely with its servant is without point or pertinency.

One of the tests which the respondent suggests to establish that the fire inspector is his servant is that the respondent would be responsible for the result of the inspector's negligence. A master may be compelled to respond in damages for the negligent act of his servant but the theatre manager would not be liable for the negligent act of the fireguard in the performance of his duties because the manager can not direct or control the acts of the fireguard. The board of fire commissioners has certified to the competency of the fireguard. The fireguard cannot be discharged by the manager without permission from the board of fire commissioners. The manager is not the master and the fireguard is not a servant. See *Durkin* v. *Kingston Coal Co. et al.,* 171 Penn. 193, which was an action of negligence for injury to a coal miner brought against the mine owner. The statute provided that no person "shall be permitted to act as mine foreman" until after examination by an examin-

·ing board created by the state and a certification as to qualification by the mine inspector appointed by the governor. The statute required all mine owners and operators to "employ" a certified mine foreman under penalty of a fine of twenty-five dollars per day. The duties of the mine foreman are prescribed by the act and the owners or operators of the mines can not interfere with his duties. The act provides that "for any injury to person or property occasioned by any violation of this act or any failure to comply with its provisions by any . . . mine foreman a right of action shall accrue to the party injured against said owner or operator for any direct damage he may have sustained thereby." The court, holding that the mine owner was not liable in spite of the statute making him liable for the negligence of the certified mine foreman, said: "This statute regarded as a whole is an extraordinary piece of legislation. Through it the law-makers say to the mine owner, 'you can not be trusted to manage your own business. Left to yourself you will not properly care for your own employees. We will determine what you shall do. In order to make certain that our directions are obeyed we will set a mine foreman over your mines with authority to direct the manner in which your operations shall be conducted, and what precautions shall be taken for the safety of your employees. You shall take for this position a man whom we certify to as competent. You shall pay him his salary. What he orders done in your mines you shall pay for. If, notwithstanding our certificate he turns out to be incompetent or untrustworthy you shall be responsible for his ignorance or negligence.'" The statute was held to be unconstitutional so far as it purported to make the mine owner liable for the negligence of the certified foreman.

The respondent contends that if the provisions of Section 5 are held to be valid such determination will require us to approve the constitutional soundness of all legislation which may assume to fix by statute the wages of private employees when the performance of their duties has any relation to

public safety, as, for example, the wages of locomotive engineers, motormen, chauffeurs and the like; and finally that we must approve legislative regulation of the wages of any class of workmen with which the General Assembly may see fit to deal. Such argument is clearly specious. All such private employes and workmen are servants of a private master performing such master's business in accordance with the master's direction. That the safety of the public frequently depends upon the proper performance of their duties is merely an incident of their occupation. A fire inspector stationed in a theatre is not engaged in the service of a private master. He is performing the duties prescribed by law under the direction of a public board. His duty is to the public. The public is the master and it is for the public as represented by the law-making power of the State to fix his compensation and to regulate the terms of his employment. No principle is better settled than that compensation for the performance of public duties may be fixed by law whether such compensation is paid from the public treasury or charged against the business in relation to which it is to be performed.

The burden upon the theatre manager consists in being obliged to pay the compensation of the fireman or fireguard stationed in his theatre; it is a matter of no consequence to him, and it has no bearing upon the reasonableness of the charge or the constitutionality of the act whether he be required to pay said compensation to the city and the city pay the fireman or inspector, or that the manager be directed to pay the fireman or inspector directly. The manner of payment is a matter of detail, the vital consideration is whether such manager should be compelled to pay the charge at all. There is a long line of decisions holding that whenever any business or line of business affects the public health, safety, morals or welfare, thereby becoming a proper subject for police regulation, the fees and charges for inspection or otherwise for protecting the public against the dangers incident to such business may be imposed upon the

business itself, regardless of whether any special franchise or privilege had been conferred upon such business, or that it was one affected with a public interest or was one merely of private interest.

In *Willis* v. *Standard Oil Co.*, 50 Minn. 290, it was held that a statute requiring illuminating oil which was held for sale to be first inspected, and fixing the fees for inspection, was a valid exercise of the police power, and the court said: ''On its face the act is a *bona fide* police regulation, a proper inspection law and not a law levying a tax. What is a reasonable fee for inspection under such laws must depend largely upon the sound discretion of the legislature having reference to all the circumstances and necessities of the case; and unless it is manifestly unreasonable in view of the purpose of the law as a police regulation, the court will not adjudge it a tax.''

In *Consolidated Coal Co.* v. *The People*, 186 Ill. 134, the court held ''that under the police power the legislature has the right to provide for the inspection of mines and that it also has the right to place the burden of the expense of such inspection upon the mine owners,'' and that a law was not in violation of the Fourteenth Amendment of the Constitution of the United States as one denying equal protection of the laws or taking property without due process of law because it did not lay down proper rules for its impartial execution in fixing fees to be charged upon a basis of the number of men employed, size of the mine or ''some definite circumstance or condition,'' and fixing a reasonable number of inspections to be made annually by which the exercise of an arbitrary discretion might be avoided. The inspection fee was fixed at not less than six dollars nor more than ten dollars a visit. By statute it became the inspector's duty to inspect ''as often as he may deem necessary and proper'' and ''at least four times a year.''

In *City of New Orleans* v. *Kee*, 31 So. (La.) 1014, the court held an ordinance constitutional which provided for inspection of laundries and required the laundry to pay the

inspection fee. In *Morgan's Steamship Co.. v. Louisiana Board of Health,* 118 U. S. 455, a statute was held to be valid which required steamship vessels to submit to inspection and pay a fee therefor.

In *Baldwin* v. *Louisville and Nashville R. R. Co.,* 7 L. R. A. (Ala.) 266, an act made it a misdemeanor for any railroad to have in its employ any engineer, fireman, brakeman, conductor, gateman, signal-man, &c. who did not "possess a certificate of fitness therefor in so . far as color blindness and visual powers are concerned" issued by a medical examiner provided for by the act. The railroad company was obliged to pay the examination fee fixed by the act as three dollars. The plaintiff brought suit to recover from the railroad his fees for examining in his capacity as medical examiner employees of the defendant. The court held that the act was not in violation of the Fourteenth Amendment.

In *People* v. *Harper,* 91 Ill. 357, the court held an act constitutional which created a board with powers to fix the fees for inspecting grain. In *Louisiana State Board* v. *Standard Oil Co.,* 31 So. 1015, the court held that the act which required the plaintiff board to inspect coal oil throughout the state by reasonable implication confers upon the board authority to exact an inspection fee from the dealer in oil. In *Nashville &c. Railroad* v. *Alabama,* 128 U. S. 96, the court considered the provision of a statute requiring a railroad to pay a fee fixed at three dollars for the examination of certain of its employees as to color blindness and visual powers and held the same to be constitutional as not depriving such railroad of property without due process of law. In *Smith* v. *Ala.,* 124 U. S. 465, the plaintiff in error, a locomotive engineer, had been convicted of operating a locomotive without a license prescribed in a statute which required all engineers to be examined by a state board of examiners as to their fitness to operate locomotives and forbade the operation of a locomotive by an engineer, not possessing such license, on the main line for the purpose of hauling passengers or freight. The examination fee was

fixed at three dollars which was required to be paid by the engineer. The court held that the act did not contravene the Constitution of the United States and that the statute was valid under the police power of the state. Upon the point now under consideration see *Charlotte &c. R. R.* v. *Gibbes,* 142 U. S. 386; *Daniels* v. *Hilgard,* 77 Ill. 640; *People* v. *Smith,* 108 Mich. 527; *People* v. *Squire,* 107 N. Y. 593; *State* v. *Murlin,* 137 Mo. 297; *Commonwealth* v. *Bonnell,* 8 Phila. Rep. 534; *Davis Coal Company* v. *Polland,* 158 Ind. 607. A somewhat novel case of a law aiming to protect the public against the dangers incident to a business is considered in *State* v. *Cassidy,* 22 Minn. 312. An act making it an offence to sell spirituous liquors without having a special license (in addition to all other licenses) for which a fee of ten dollars must be paid "to establish a fund for the foundation and maintenance of an asylum for inebriates" was held to be a valid exercise of the police power. In *Noble State Bank* v. *Haskell,* 219 U. S. 104, the court considered a statute of Oklahoma which provided for a levy upon all banks existing under the laws of the state an assessment of a percentage of each bank's average deposits to pay the loss arising to depositors in banks which might become insolvent. The court sustained the constitutionality of this statute, and held that when the legislature of Oklahoma declared that said regulation was a necessary safeguard to banking the court cannot say that it is wrong. Upon petition for rehearing the court said, 219 U. S. at p. 580, "We fully understand the practical importance of the question and the very powerful argument that can be made against the wisdom of the legislation, but on this point we have nothing to say, as it is not our concern."

It is no just criticism of the amount of compensation fixed by law for public office or public service that perhaps some person may be found in the community who will undertake to perform it for less. The provisions of Section 5 wherein the General Assembly in its legislative discretion has fixed three dollars per day as the compensation of a fire-

guard cannot be regarded as unconstitutional because the respondent before the passage of the act was able to make an arrangement with Mr. Gallagher to act for two dollars per day. Such a principle if adopted by this court would lead to a declaration of the unconstitutionality of a great number of acts of the General Assembly in which a fee is fixed or compensation provided for the performance of some public act.

We have in this State many statutes providing for inspection and inspection fees. See the following chapters of General Laws, 1909. Chapter 220 requires the insurance commissioner to examine insurance companies and the insurance company to pay the commissioner the expense of such examination. Chapter 157 provides for the inspection and branding of beef and pork and fixes the fees which are to be paid by the dealer and retained by the inspector and imposes penalties in certain cases for sale without inspection. Said Chapter 157 and Section 6 of Chapter 30 were amended by Chapter 1026 of the Pub. Laws, 1914, by fixing a salary for the state inspector and providing that the inspection fees should be turned over to the general treasurer but the cities and towns may still elect inspectors of beef and pork and "provide for their compensation by salary or fees." Chapter 158 provides for the inspection of hides and leather, fixes the inspector's fees which are to be paid by the owner and retained by the inspector. Chapter 159 provides for the inspection of lime, fixes the inspection fees to be paid by the burner of the lime and retained by the inspector and imposes a penalty for selling or exporting lime not branded by the inspector. Chapter 160 provides for the inspection of fish, fixes the inspection fees to be paid by the owner and retained by the inspector and imposes a penalty for selling fish not inspected and branded. Chapter 161 provides for the inspection and survey of lumber shipped into this State, fixes the fees to be paid by the owner and retained by the inspector and imposes a penalty for dealing in such lumber which has not been inspected and surveyed. Chapter 162 provides for the inspection of hoops, fixes the

fees to be paid by the owner and retained by the inspector and imposes a penalty for shipping hoops which have not been inspected. Chapter 163 provides for the inspection of scythe-stones, fixes the fees to be paid by the owner and retained by the inspector and imposes a penalty for selling or exporting scythe-stones which have not been inspected. Chapter 164 provides for the inspection of salaratus, soda and cream of tartar, fixing a fee for inspection and certificate of analysis which is to be paid by the dealer and retained by the inspector and imposes a penalty for selling such articles when impure. Chapter 165 provides for the measure and sale of grain, meal and salt, fixes the fees to be paid by the owner and retained by the official measurer and imposes a penalty for the sale of such articles from a vessel or railroad car in quantities greater than twenty-five bushels without having the same duly measured and duly certified by the official measurer. Chapter 166 provides that "all cotton sold in this state, unless specially agreed, shall be weighed" by the official weigher; said chapter fixes the fees which are to be paid by the owner and retained by the weigher. Chapter 170 provides for the inspection, sale and keeping of inflammable and explosive fluids, fixes the fees to be paid by the dealer and retained by the inspector and imposes penalties for keeping or selling certain petroleum oils and products thereof which have not been inspected. Chapter 171 provides for weighing of neat-cattle, fixes the fees for weighing, one-half of which shall be paid by the seller and one-half by the buyer, to be retained by the town weigher and imposes a penalty on persons "slaughtering or weighing any neat-cattle, and being obliged to account for the same to the owner or seller thereof as aforesaid, who shall not weigh and account" for all "parts of such cattle denominated weighable as aforesaid." Chapter 194 provides for sealing of weights and measures, fixes the fees which are to be paid by the owner and retained by the official sealer and imposes a penalty for using weights or measures which have not been sealed. Chapter 195 provides for gauging,

fixes the fees to be paid by the owner and retained by the gauger and imposes a penalty for selling commodities by gauge or gauge-marks not made by an official gauger.

Perhaps the market man like the theatre manager would prefer to have his business inspected and regulated by his own servant. We have no doubt that the market man could save a considerable expense by having his large number of weights and measures sealed by one of his employees possessing the requisite skill. It is probable that such market man could arrange with his employee to do the work for a compensation much less than the statutory fee of the public sealer. That fact however has no bearing upon the question of the constitutionality of the statute relating to the sealing of weights and measures. It is the policy of the law to surround a public official with a degree of independence the better to enable him faithfully to perform his duties to the public.

My conclusion that Section 5 provides for the performance by the fire inspector of a public duty and not of a private service for the theatre manager is really determinative of the questions before us because, as I have already said it is undoubtedly within the power of the General Assembly to fix the compensation and regulate the employment of this public inspector. I will, however, consider at length the contention of the respondent that the provisions fixing the compensation of this public servant at three dollars per day, providing that his salary shall not be reduced by the theatre manager and that he may not be discharged by the theatre manager are entirely arbitrary and have no reasonable relation to the protection of audiences in theatres in the city of Providence.

For the proper understanding of the cases in which a party has questioned the constitutionality of legislation purporting to be enacted under the police power, the distinction between the question of legislative _power_ and the matter of legislative _policy_ must always be borne in mind. Mr. Justice HUGHES in _Chicago &c._ v. _McGuire_, 219 U. S. at p.

569, says: "The principle involved in these decisions is that where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for government to effect, the legislature transcends the limits of its power in interfering with liberty of contract; but where there is reasonable relation to an object within the governmental authority, the exercise of the legislative discretion is not subject to judicial review. The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." In *McLean* v. *Arkansas*, 211 U. S. 547, the court said, "The legislature, being familiar with local conditions, is, primarily, the judge of the necessity of such enactments. The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power."

Courts as evidenced by their opinions in many cases have scrutinized very carefully the claims that legislation in question before them was within the scope of the police power. When, however, it has been determined that the matter as to which regulation has been provided did have such a relation to the public health, safety, morals and welfare as to present a proper occasion for the exercise of the police power then it has been recognized that a very wide discretion rests in the legislature in determining the policy or the methods to be employed in its exercise. In *Holden* v. *Hardy*, 169 U. S. 366, at page 397, the court said: "Though

reasonable doubts may exist as to the power of the legislature to pass a law, or as to whether the law is calculated or adapted to promote the health, safety. or comfort of the people, or to secure good order or promote the general welfare, we must resolve them in favor of the right of that department of government." In speaking of the limits of judicial discretion the court in *Wilson* v. *New*, 243 U. S. 332, at p. 359, said: "While it is a truism to say that the duty to enforce the Constitution is paramount and abiding, it is also true that the very highest of judicial duties is to give effect to the legislative will and in doing so to scrupulously abstain from permitting subjects which are exclusively within the field of legislative discretion to influence our opinion or to control judgment."

This principle has been adopted by this court without a contrary opinion down to the present time.

In *East Shore Land Co.* v. *Peckham*, 33 R. I. 541 at 548, this court said: "All statutes are presumed to be valid and constitutional and the burden of proving the unconstitutionality of any statute is upon the party raising the question; furthermore, the rule is that he must prove it beyond a reasonable doubt."

In *State* v. *Kofines*, 33 R. I. 211, at 218, the court said: "A reasonable doubt is to be resolved in favor of the legislative action, and the act sustained. Cooley on Constitutional Limitations, p. 252 and cases cited. 'Before an act is declared to be unconstitutional it should clearly appear that it cannot be supported by any reasonable intendment or allowable presumption. *People* v. *Supervisors of Orange*, 17 N. Y. 235, 241 . . . Therefore it is incumbent upon the respondents to satisfy this court beyond all reasonable doubt that the act in question is unconstitutional in the particulars complained of.'"

The opinion of this court in *Cleveland* v. *Tripp*, 13 R. I. 50, at 65, was as follows: "Our conclusion is, that the complainants are not entitled to relief. We have reached this conclusion not without much hesitation, but in obedience

to the rule that a statute duly enacted, however questionable it may be in point of constitutionality, is not to be pronounced void for unconstitutionality until the court is clearly convinced of it."

In the *Opinion to the Governor*, 24 R. I. 603, 606, this court said: "Both this court in *State* v. *Peckham*, 3 R. I. 289 and the Supreme Court of the U. S. in *Munn* v. *People*, 94 U. S. 113, have declared that the legislature is the exclusive judge of the propriety and necessity of legislative interference within the scope of legislative power. If a state of facts could exist which would justify legislation, it is to be presumed that it did exist."

We will now consider the policy or the method adopted by the General Assembly in Section 5 for the purpose of guarding the safety of audiences in theatres in the city of Providence. It would tend to a better understanding of this policy of the General Assembly if we should note the historical development in this State of legislation of this character. By Sec. 5, Chap. 131, Gen. Laws, 1909, it was provided that the board of fire commissioners, or in case there was no such board, the chief of the fire department, in every city should station in every theatre during the time any audience was present therein a fireman and the licensee of the theatre should pay such city for the attendance of said fireman two dollars for every day during which a performance should be given in such theatre. By reason of the great increase in the number of theatres in the city of Providence the demands upon the fire department by reason of the assignment of firemen for service in the theatres became so great that by Chapter 1366, Pub. Laws, 1916, it was provided that, instead of a fireman being stationed by the board of fire commissioners in each theatre in the city of Providence, the licensee of such theatre should "employ" a suitable person approved by said board who should be stationed in such theatre, who should there perform the duties prescribed by said board and who should have no other duties, whose continuance in service depended

O'NEIL *v.* PROVIDENCE AMUSEMENT CO. [42

upon the continued approval of the board and who should not be discharged by said licensee except with the prior approval of said board. The next change came in the January session, 1919, when by Chapter 1780 of the Public Laws it was provided that the proprietor of a theatre in Newport should pay three dollars per day instead of two dollars per day to the city for the services of a fireman stationed in a theatre. By the provisions of Chapter 1780, Public Laws, 1919, Section 5 was again amended to the form in which it now stands, the essential parts of which have been quoted above. It cannot be questioned that by the original provisions of Section 5 a city fireman stationed in a theatre was not the servant of the theatre manager but was a person performing a public function and for that public service it was within the power of the legislature to compel the theatre manager to pay the city. This is in accord with the cases cited above. For the reasons that we have named the city was relieved of the duty of assigning members of the fire department for service in theatres and the theatre manager was permitted to select a person who should act as a fireguard in his theatre but with great particularity the duties of the fireguard or inspector so selected are designated and his relations to the fire board are defined. It is clear that the legislature intended that in every respect save in the method of selection the fireguard should exactly take the place of the city fireman. Everything that the city fireman had formerly done the fireguard must do; and the exclusive oversight and control which the board of fire commissioners had over its fireman was continued in it over the fireguard selected by the theatre manager. If, instead of permitting the theatre manager to select a person for the approval of the board, the statute had provided that the theatre manager should choose for service in his theatre one from a body of theatre fire inspectors first selected and established by the board of fire commissioners would the situation have been different? In either case the manner of selection would be an immaterial circumstance. The

essential matter in determining the legal status of the fire-guard in his relations to the theatre manager is the nature of his service. It was unmistakably public service form-erly performed by the public fireman. The inspector is exercising a public function and discharging a public duty. There can be no question that for that public duty the legislature might fix the compensation. At first in its dis-cretion the legislature did not fix the compensation but left it to such arrangement as should be made between the theatre manager and the inspector. Later in its discretion the legislature saw fit to name the minimum amount of compensation which the fire inspector should receive for his public service and further provided that the same should not be reduced without the prior approval of the board of fire commissioners. This court should not assume that these later provisions were enacted from any desire on the part of the legislature either to benefit the person, who might act as fire inspector, or to oppress the theatre mana-ger; but we should assume that such provisions, in the judgment of the General Assembly, had a direct bearing upon the efficiency of the fire inspectors and hence upon the safety of theatre audiences in Providence. In accordance with the universally accepted doctrine all presumptions must be in favor of the validity of legislative action and if upon any view such action would be justified it should be permitted to stand. That has always been the position of this court. It was said in the *Opinion to the Governor*, 24 R. I. 603, "If a state of facts could exist which would justify legislation it is to be presumed that it did exist." The determination as to the reasonableness of the provisions as to compensation and whether they have a fair connec-tion with the efficiency of fire inspectors depends upon a knowledge of the facts regarding the situation, and what experience has shown to the public authorities in the city of Providence. This knowledge can be gained only by in-vestigation. The legislature can make such investigation; this court cannot. *People* v. *Smith*, 108 Mich. 527; *Horton*

v. *Old Colony Bill Posting Co.*, 36 R. I. 507.    After the
General Assembly has made its investigation and determined
upon the regulations which in its judgment are desirable
and tend to promote the public safety this court should
not oppose to that judgment of the legislature, based upon
such investigation, the Court's conclusions founded entirely
upon conjecture as to the situation.    It was stated to us in
argument that at the hearing before the committee of the
General Assembly it appeared that a certain theatre man-
ager in Providence desired to be relieved of the presence of
an inspector who appeared to said manager to be too
zealous in insisting upon an observance of the directions
which the fire board had made for the public safety; but
whose conduct and service had the full approval of said
board.    The manager was unable to discharge the in-
spector directly but accomplished the same indirectly by
reducing his compensation to such a low figure that the
inspector was forced to resign.    Upon this the legislature
in its discretion, in order that the personal interests of a
inspector should not make him seek the favor of a theatre
manager rather than zealously observe the directions of
the fire board, fixed upon three dollars per day as a fair and
reasonable minimum compensation for such inspector    in
Providence and provided that such compensation should
not be reduced save with the approval of the board of fire
commissioners.    Now we will not accept that statement
made by counsel before us, although not contradicted, as
being an exact statement of the facts nor as representing the
reason that caused the legislature to adopt said provisions,
but we will receive it as part of an argument by the State
setting forth a possible situation which might confront
the public authorities in Providence and might appeal to
the discretion of the General Assembly.    It is surely a state
of facts which could exist and as we have said in the *Opinion
to the Governor*, 24 R. I. 603, "If a state of facts could exist
which would justify legislation it is to be presumed that it
did exist."

It has been suggested that the provisions as to salary particularly the provision that the salary should not be reduced without the approval of the fire board, are entirely unnecessary provisions; that the object of the legislation which is to protect the safety of audiences would be as adequately secured if these provisions were omitted. It has been urged that if an inspector appears to the board of fire commissioners to be unfaithful it may require his removal and the selection of another man; and that to give to said board rather than to the theatre licensee control over his salary is entirely unnecessary. The value of this method of protecting a theatre audience depends upon the efficiency of the inspection. It requires no argument to establish the proposition that it will tend to that efficiency if the inspector is in every way dependent upon the board and all his interests compel him to a faithful and painstaking observance of their directions, rather than that as to his personal interest he should look to the theatre manager whose notions of necessary regulation may not be in accordance with that of the fire board. If in that divided loyalty his desire to obtain the favor of his paymaster leads him to be lax in his duty to the public it is not enough to say that for that laxity he may be removed for before the inefficiency may be discovered by the board a serious tragedy may have occurred. The suggestion of a lack of necessity for any of these regulations is entirely irrelevant to the consideration of the constitutionality of the section in question. Whether or not a given regulation shall appear to a court to be necessary or unnecessary is not the criterion of constitutionality. The regulations which should be prescribed to effect a given purpose are matters addressed to the wide powers of discretion and judgment possessed by the General Assembly and it is no valid objection to a regulation that its necessity should not be apparent to some mind which is not fully informed as to the situation and the particular purpose which is behind the regulation. If it was for the members of a court to prescribe the policy

and method of regulation they might adopt an entirely different scheme. They might be of the opinion that the plan of the legislature is practically faulty and ill-advised; that it will quite likely fail of its purpose or that some of its details are unnecessary but for any or all of these reasons the legislation in question should not be declared unconstitutional unless the provisions are without doubt unrelated to the matter under consideration and so clearly unreasonable and arbitrary as to 'be oppressive. Our fundamental test must be applied. If a state of facts could exist which would justify the regulation it is to be presumed that it did exist. In the case dealing with billboard advertising in the city of Providence, *Horton* v. *Old Colony Bill Posting Co.*, 36 R. I. 507, the ordinance under consideration was passed in accordance with the authority given by statute to the city council of Providence to regulate such outdoor advertising "in order to preserve the health, safety, morals and comfort of the inhabitants of this state." This was a delegation to said city council of a part of the police power of the State. An examination of said ordinance discloses a number of regulations which are not apparently necessary for the preservation of the health, safety, morals and comfort of the inhabitants of the State. As to a number of the provisions this court was not free from doubt even as to their reasonableness, yet they were approved. The court held that "In view of the fact that the lawmaking body has far more opportunity to ascertain and meet the public need than the court can have, and in view of the wide latitude permitted the legislative branch in determining the public needs and the appropriate remedies, the court should uphold the limitations on size" (of billboards) "imposed by this section, which in our opinion are 'not clearly unreasonable," and the court quoted with approval the language of the opinion *In re Wilshire*, 103 Fed. 620, as follows: "I entertain a good deal of doubt in respect to the reasonableness of the maximum limitation placed upon the structures in question by the municipal authorities of the

city of Los Angeles, but the fact that this doubt exists is
sufficient reason for the court to decline to adjudge the
ordinance invalid.   It is only in clear cases that such a
judgment should be given."

In the foregoing part of the opinion I have dealt with the
respondent's various contentions that said Section 5 de-
prives the respondent of its liberty and property without
due process of law.   We find no validity in any of them.
They are all based upon its misconception that the relation
of the theatre licensee to the fire inspector is that of master
and servant; whereas in fact and law the fire inspector is a
public servant performing public duties, which it was clearly
within the power of the State to regulate and for which it
might fix a compensation, and charge the payment of the
same upon the theatre manager whose business was the
subject of the regulations.

The respondent's contention is that inasmuch as said
Section 5 does not operate uniformly upon all the theatres
in the State the act is therefore in violation of Article I,
Section 2 of the Constitution of Rhode Island which de-
clares that "the burdens of the state ought to be fairly
distributed among its citizens" and is in violation of the
Fourteenth Amendment to the Constitution of the United
States which requires that no state shall deprive any person
of life, liberty or property without due process of law, nor
deny to any person within its jurisdiction the equal pro-
tection of its laws.

The respondent contends that said Section 5 imposes an
unequal burden on him in the conduct of his business, in
other words, imposes a heavier burden upon his theatre and
all other theatres situated in the city of Providence than it
imposes on the same business in other cities.   It is not
suggested that the act is invalid because it operates only
as to cities and does not apply to the towns and yet some
of our towns have thickly populated and congested centers
in which theatres are conducted.   In Providence, the largest
city in the State, we have special provisions for supplying

fireguards or fire inspectors for the theatres.  No fireguard is required for theatres situated in towns.  In the cities of Pawtucket and Cranston theatres must pay the city two dollars per day for a regular fireman stationed in the theatre; theatres in Newport pay the city three dollars per day for a regular fireman; theatres in Providence and Newport pay the same amount.  In Providence, Woonsocket, and Central Falls theatre licensees must "employ" a suitable person approved in Providence by the board of fire commissioners and in Woonsocket and Central Falls by the chief of the fire department.  In Providence the theatre must pay whatever price may be necessary which shall not be less than three dollars per day to secure a competent person approved by the board of fire commissioners.

The statute makes three classes of theatres and imposes a slightly different burden on each class, Providence and Newport in one class, Pawtucket and Cranston in another class and those in Woonsocket and Central Falls in a third class. The Providence class differs from the Woonsocket and Central Falls class in that the Providence theatre must pay the fireguard at least three dollars per day and such fireguard is not permitted to have any other duties whereas in the Woonsocket and Central Falls class no minimum fee is fixed and the fireguard is not forbidden to have other duties.

It is to be noted that the act applies equally to all theatres in the city of Providence.

Said Section 5 is not in conflict with the Constitution of Rhode Island, Article I, Section 2, which reads as follows: "All free governments are instituted for the protection, safety and happiness of the people.  All laws, therefore, should be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens."

In the case of *In re Dorrance Street*, 4 R. I. at 249, AMES C. J., in discussing the last clause of the foregoing section said:  "We will not stop to notice the very general language and declaratory form of this clause; setting forth

principles of legislation rather than rules of constitutional law—addressed rather to the general assembly by way of advice and direction, than to the courts, by way of enforcing restraint upon the lawmaking power.   We do not mean to say that a law, purporting to impose a tax or burden of some sort upon the citizen may not be in its distribution of the burden, both in design and effect, so outrageously subversive of all the rules of fairness, as not to come so far within the purview of this general clause, as to enable the court to save the citizen from oppression by declaring it to be void. But evidently a wide discretion with regard to the distribution of the burdens of state amongst the citizens was intended to be reposed in the general assembly by the will of the people, as signified in this clause of the constitution. The form is 'ought to be,' the word is 'fairly' distributed, not 'equally' even—unless equality be fair, which it is not always in any sense, and never is in some senses;   and especially, the words are not 'equally upon property,' or words to that effect, as in the constitution of Louisiana."
.   .   .   "All taxation is more or less unfair, and in any proper sense, even unequal.   Perfect fairness would be, to make all those who are benefited by the burdens of the state to bear them, and to extend the burden in due proportion to every person according to this benefit."   Of course it is not only impracticable but impossible to frame and enforce laws which do exact justice to all.   Our statute requiring motor vehicles to be registered and licensed is a good example.   In order to maintain and improve our state highway system a tax is imposed on motor vehicles;   no similar tax is imposed on horse-drawn vehicles using and impairing the highways.   And again, the annual tax itself is graduated according to the horse-power of the motor vehicle without any reference whatever to the time or distance which motor vehicles travel on the highways;   motor trucks, particularly those transporting heavy loads, probably do far greater damage to the highways than do pleasure motor vehicles which are required to pay a registration fee (dependent

upon horse-power) ranging from $5 to $25, while commercial motor vehicles, and motor trucks regardless of the horse-power thereof pay a fee of $7; but such legislation has been held to be not unconstitutional. *Hendrick* v. *Maryland,* 235 U. S. 610; *Kane* v. *New Jersey,* 242 U. S. 160. While the Fourteenth Amendment to the Federal constitution provides that no state shall deny to any person within its jurisdiction the equal protection of its laws this provision has been uniformly held to be entirely consistent with the power of a state legislature to make classification as to the subjects of legislation provided all members of a class are treated equally. The following language was quoted with approval by this court in *Sayles* v. *Foley, Blomquist,* 38 R. I. p. 491: "In *Jeffrey Mfg. Co.* v. *Blagg,* 235 U. S. 576, it is stated: 'This court has many times affirmed the general proposition that it is not the purpose of the Fourteenth Amendment in the equal protection clause to take from the States the right and power to classify the subjects of legislation. It is only when such attempted classification is arbitrary and unreasonable that the court can declare it beyond the legislative authority.' In *Kidd* v. *Ala.* 188 U. S. 730, 733, the court says: 'We need not repeat the commonplaces as to the large latitude allowed to the states for classification upon any reasonable basis,' " (citing cases). See also *Horton* v. *Old Colony Bill Posting Co.,* 36 R. I. 507; *Miller* v. *Wilson,* 236 U. S. 373; *Bosley* v. *Mc. Laughlin,* 236 U. S. 385; *Singer Sewing Machine Co.* v. *Brickell,* 233 U. S. 304; *Keokee Consolidated Coke Co.* v. *Taylor,* 234 U. S. 224; *International Harvester Co.* v. *Missouri* 234 U. S. 199; *St. John* v. *New York,* 201 U. S. 633, 637.

Mr. Justice VAN DEVANTER, in discussing the power of the legislature to make classification, said in *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. at p. 78, "The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws,

but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary," citing,—'*Bachtel* v. *Wilson*, 204 U. S. 36, 41; *Louisville & Nashville R. R. Co.* v. *Melton*, 218 U. S. 36; *Ozan Lumber Co.* v. *Union County Bank*, 207 U. S. 251, 256; *Munn* v. *Illinois*, 94 U. S. 113, 132; *Henderson Bridge Co.* v. *Henderson City*, 173 U. S. 592, 615."

As was said in *Heath & Milligan* v. *Worst*, 207 U. S. at p. 354: "A classification may not be merely arbitrary but necessarily there must be great freedom of discretion, even though it result in 'ill-advised, unequal and oppressive legislation.' "

In *State* v. *Read, supra* (12 R. I. 137), this court held valid a statute making a very novel classification in reference to the use of land within one mile of an outdoor meeting held by any religious society. The statute prohibited all persons other than the religious society except "innkeepers, grocers or other persons from pursuing their ordinary business at their usual place of doing business" and persons selling victuals in their usual place of abode from selling food or other merchandise within one mile of such meeting. The act was unnecessary to prevent the sale of intoxicating liquors as at the time of its passage statutes were in force, with penalties more severe, prohibiting the sale of intoxicating liquors. - To sell food on one's property (except "in his usual place of abode") within one mile of an out-door meeting held by any religious society is made a misde-

meanor by the statute unless the sale be made with the consent of the society. Had the society consented to the acts complained of the defendant would have been guilty of no offence. Giving the society the right to consent to such sales might be regarded as tantamount to creating a monopoly in the sale of food, &c., and hence creating a favored class. The statute prohibited all persons other than the society within one mile radius of the meeting from using their property in a particular manner without consent of the society. The statute imposed an unequal burden upon one class of land owners. It says in substance, whenever a religious society shall spread its tent in a community and hold its meetings or holds its meetings out of doors in such community that all land owners within one mile of such meeting lose the right, while such meeting is being so held, to use their property in the same manner as they may lawfully use it before the meeting commenced and after it ended. Shore resorts, county fairs and even the same religious societies when holding their meetings in a church edifice are not similarly protected from encroachment. But as the act applied to all religious societies it was upheld as a valid exercise of the police power of the state.

In *American Sugar Refining Co.* v. *Louisiana*, 179 U. S. 89, it was held that "a state statute imposing a license tax upon persons and corporations carrying on the business of refining sugar and molasses does not, by exempting from such tax 'planters and farmers grinding and refining their own sugar and molasses,' deny sugar refiners the equal protection of the laws within the Fourteenth Amendment."

In *Holden* v. *Hardy*, 169 U. S. 366, an act limiting labor in mines only to eight hours a day was held a valid exercise of the police power and not in violation with the Fourteenth Amendment.

In *McLean* v. *State of Ark.* 211 U. S. 539, the court refused to hold that a legislative act requiring coal to be measured for payment of miners' wages before screening to be an unreasonable police regulation and held that the act was

not unconstitutional under the due process or the equal protection clause of the Fourteenth Amendment and held that it was not an unreasonable classification to divide coal mines into those where less than ten miners are employed and those where more than that number are employed and that a state police regulation is not unconstitutional under the equal protection clause of the Fourteenth Amendment because applicable only to mines where more than ten miners are employed.

In *Louisiana St. Board of Health* v. *Standard Oil Co.*, 31 So. 1015, the court considered an act which required the inspection of coal oil "in every city and town of not less than two thousand inhabitants except the city of New Orleans." Inspection in the latter city had been provided for by a special act.   The court assumed that there was no question as to the constitutionality of the act under consideration.

In *Minn. Ry.* v. *Beckwith*, 129 U. S. 26, a statute providing that if live stock strayed upon railroad tracks, by reason of there being no fence, where the railroad had the right to fence, and were injured or killed, the railroad should be liable for the damage, and if such corporation neglects to pay the value of damage done to such stock within thirty days after notice in writing, accompanied by an affidavit of such injury or destruction, "such owner shall be entitled to recover double the value of the stock killed or damages caused thereto" was held not to be in violation of the equal protection clause of the Fourteenth Amendment.   And in *Mo. Pacif. R. R. Co.* v. *Humes*, 115 U. S. 512, a similar statute was held to be a valid police regulation as it provided against accident to life and property.

*Mountain Timber Co.* v. *Washington*, 243 U. S. 219.   The Washington Workmen's Compensation Act provided for the creation of a state fund for compensation of workmen injured and dependents of workmen killed in employments classed as hazardous and abolished (except in certain cases) the action at law by employees against employers for damage due to negligence.   The different hazardous industries were

classified. The scheme was to tax each employer engaged in a given class in proportion to his payroll to meet the loss in such class. Held that the act did not violate the Fourteenth Amendment. To the same effect see *Sayles* v. *Foley, Blomquist*, 38 R. I. 484.

In *N. Y. Central R. R. Co.* v. *White*, 243 U. S. 188, the N. Y. Workmen's Compensation Act, requiring the employer to secure the compensation required by the act to injured employees and their dependents by insurance or by deposit of securities with the state commissioner was held valid as not denying the equal protection of the laws.

In *Noble State Bank* v. *Haskell*, 219 U. S. 104, the court sustained an Oklahoma statute which levied upon all banks existing under the laws of the state an assessment of a percentage of the bank's average deposits to pay the loss of depositors in insolvent banks.

In *Minn. Iron Co.* v. *Kline*, 199 U. S. 593, an act provided that in actions of negligence for personal injuries against railroads the negligence of a fellow servant was no defence. Held not in violation of the Fourteenth Amendment and not class legislation. To the same effect see *Mo. Pac. R. R. Co.* v. *Mackey*, 127 U. S. 205. In *Lieberman* v. *Van de Carr*, 199 U. S. 552, a statute prohibiting the sale of milk without a permit from the state board of health was held not in violation of the Fourteenth Amendment as depriving persons in that business of their property without due process of law or denying them the equal protection of the laws.

In *Chicago &c. R. R. Co.* v. *McGuire*, 219 U. S. 549, the court, in an opinion by Mr. Justice Hughes, considered the validity of a statute limiting the rights of railroads and their employees to contract. The act applied to railroad corporations only. It was held that the "state has power to prohibit contracts limiting liability for injuries made in advance of the injury received, and to provide that the subsequent acceptance of benefits under such contracts shall not constitute satisfaction of the claim for injuries received

after the contract," and that such a statute does not impair the liberty of contract, take property without due process of law or deny equal protection of the law in violation of the Fourteenth Amendment.

In *N. Y. v. Squire*, 145 U. S. 175 (107 N. Y. 593), it was held that an electrical commission act, to regulate electric light, power, etc., companies, violated no contractual rights of the corporation and was not in violation of the Fourteenth Amendment, that no state shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. The board of commissioners was authorized to assess the several corporations affected by the act to pay the expenses and salaries of the board. The act was held to be not unconstitutional notwithstanding the fact that it applied only to cities with a population of more than five hundred thousand.

In the case of *In re Williams, Petr.*, 79 Kas. 212, the petitioner was convicted of selling powder in violation of a statute which provided "it shall be unlawful for any individual, firm or corporation to sell, offer for sale or deliver for use at any coal-mine or mines in the State of Kansas, black powder in any manner except in original packages containing twelve and one half pounds of powder, said package to be securely sealed," &c. The act applied to no explosive except black powder and was limited to coal mines, but the court held that the statute did not violate the state constitution or the equal protection clause of the Fourteenth Amendment. The court quoted with approval from *Minn. R. R. Co. v. Beckwith*, 129 U. S. 26, 29, as follows: "But the clause (of the fourteenth amendment) does not limit, nor was it designed to limit, the subjects upon which the police power of the state may be exerted. The state can now, as before, prescribe regulations for the health, good order and safety of society, and adopt such measures as will advance its interests and prosperity. And to accomplish this end special legislation must be resorted to in numerous cases,

providing against accidents, disease and danger, in the varied forms in which they may come. The nature and extent of such legislation will necessarily depend upon the judgment of the legislature as to the security needed by society."

See also *State* v. *Cassidy*, 22 Minn. 312; *Charlotte &c. R. R.* v. *Gibbes*, 142 U. S. 386; *Davis Coal Co.* v. *Polland*, 158 Ind. 607; *State* v. *Murlin*, 137 Mo. 297; *Gundling* v. *Chicago*, 177 U. S. 183; *Dayton Coal & Iron Co.* v. *Barton*, 53 S. W. (Tenn.) 970; *Harbison* v. *Iron Wks.* 103 Tenn. 421, 53 S. W. 955; *Daniels* v. *Hilgard*, 77 Ill. 640; *W. W. Cargill Co.* v. *Minn.*, 180 U. S. 452; *People* v. *Smith*, 108 Mich. 527; *Opinion to the Governor, in re Met. Park Loan*, 34 R. I. 191.

Suppose the legislature instead of passing the act in question, classifying the theatres of the state according to cities, had passed a general enabling act authorizing the various cities to adopt ordinances for the protection of audiences in theatres against fire. Each city pursuant to such authority might adopt an ordinance, to meet the needs of the particular city, different from that adopted for every other city, and yet each ordinance would be valid provided it was fair and reasonable. It is axiomatic that the legislature can do that which it can delegate others to do. Each city would be permitted a wide latitude in determining its peculiar needs and appropriate remedy. Had each of our several cities passed an ordinance identical with the provisions of said Section 5 as applicable to such city, could it be said that any one of such ordinances was clearly unfair and unreasonable?

Pub. L. Chap. 542, passed at the January session, 1910, was "An act authorizing cities and towns to regulate certain out-door advertising." Pursuant to this act the city of Providence passed Chap. 443 (1910) of the ordinances of the city of Providence which ordinance provided with great detail for the regulation of billboards and out-door advertising. Said ordinance did not affect all classes equally. It pro-

hibited the advertising of intoxicating liquors within two hundred feet of a school house or church. It required billboards on roofs of buildings to be constructed, in one section of the city, of incombustible materials and contained no such requirement for other sections of the city. The enabling act and the ordinance passed pursuant thereof each defines the term "out-door advertising," and provides that the term "shall not include advertising located upon private property and relating exclusively to the business conducted on such property or the sale or rental thereof, or advertising in or upon the cars and stations of any common carrier." If it is unnecessary to regulate out-door advertising relating to the business conducted on the property where the advertisement is located it is not entirely clear why it should be necessary to regulate such advertising when it does not relate to the business conducted on such property; but the act affected equally all persons similarly situated and in *Horton* v. *Old Colony Bill Posting Co., supra,* this court held that the enabling act and ordinance were each valid and were not obnoxious to either the Constitution of Rhode Island, Article I, Section 10 or the Constitution of the United States, Article XIV of Amendments, Section 1, as depriving a person of his property without due process of law nor as denying to a defendant the equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States.

Said Section 5 operates alike upon all theatres in the city of Providence and it can by no means be said to be clearly unfair or unreasonable in its provisions applying to theatres in the city of Providence. Indeed, with the present high price of wages it would seem that the respondent is fortunate if he can obtain for three dollars a qualified and duly approved fireguard to be in attendance on his theatre throughout the day and evening performance.

The respondent's other claims of unconstitutionality in Section 5 have been sufficiently answered in the foregoing. We may add that as to Article I, Section 10 of the Constitu-

tion of Rhode Island it has been held in numerous cases that it is a provision guarding the rights of persons accused of crime and that the rights of property of other persons are guarded by other clauses of the consitution of this State or by the provisions of the Federal constitution. *State* v. *Keeran,* 5 R. I. 497; *State* v. *Armeno,* 29 R. I. 431; *State* v. *Rosenkrans,* 30 R. I. 374; *State* v. *Hand Brewing Co.,* 32 R. I. 56; *East Shore Land Co.* v. *Peckham,* 33 R. I. 541. In *Reynolds* v. *Randall,* 12 R. I. 522, the court said that "grammatically the provisions there seem to apply only in favor of persons accused of crime" yet in that case the court appears to give it a somewhat broader application.

In my opinion said Section 5 is not invalid for any of the reasons urged against it by the respondent.

SWEETLAND, J. I have examined the opinion of Mr. Justice VINCENT and that of Mr Justice RATHBUN. From such examination it appears to me that the opinion of Mr. Justice VINCENT fails to appreciate the legal nature of the relation between a theatre licensee and a fire inspector which has been created by the statutory provision in question. Particularly is it to be regretted that in a vital matter, involving public safety, the majority should disregard the principles, heretofore prevailing in this State, by which the constitutional validity of statutory enactments ought to be tested. The recognition and application of those principles appear to me to be essential to the preservation of the proper balance between the respective powers and functions of those coördinate departments of our government, the General Assembly and the Supreme Court. I unreservedly concur in the comprehensive opinion of Mr. Justice RATHBUN.

*Elmer S. Chace, Henry C. Cram, Ellis L. Yatman,* for complainant.

*Alexander L. Churchill, Philip C. Joslin, John E. Bolan,* for defendant.